# **EXHIBIT 12**

# DIGITAL EARTH MEDIA INC.
## SERIES SEED PREFERRED STOCK SUBSCRIPTION AGREEMENT

**THIS SERIES SEED PREFERRED STOCK SUBSCRIPTION AGREEMENT** (this "**Agreement**") is effective as of April 19, 2022 (the "**Effective Date**"), between **DIGITAL EARTH MEDIA INC.**, a Delaware corporation (the "**Company**") and **HI INVESTMENTS, LLC**, a Colorado limited liability company ("**Purchaser**").

### RECITALS

**WHEREAS**, Purchaser desires to purchase, and the Company desires to issue and sell, shares of the Company's Series Seed Preferred Stock ("**Series Seed Preferred**") on the terms and conditions of this Agreement;

### AGREEMENT

**NOW THEREFORE,** in consideration of the foregoing premises, the representations, warranties, and covenants contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **PURCHASE AND SALE; CLOSING.**

   (a) **Purchase and Sale.** Subject to the terms and conditions hereof, Purchaser hereby agrees to purchase from the Company and the Company hereby agrees to issue and sell to Purchaser 396,341 shares of Series Seed Preferred (the "**Shares**") at a purchase price of $0.82 per share (the "**Purchase Price**") at the times and in the amounts set forth in this Agreement. No fractional shares shall be issued pursuant to this Agreement.

   (b) **Closing.** The closing of the purchase and sale of 396,341 of the Shares pursuant to this Agreement, including payment for and issuance thereof (the "**Closing**," and the date thereof, the "**Closing Date**") shall take place on the date hereof, remotely by exchange of signatures via facsimile, electronic mail (including delivery of a PDF or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com), or any other transmission method, which signatures shall be deemed to have been duly and validly delivered and be valid and effective for all purposes, or at such other time and place as the Company and the Purchaser may otherwise agree. At the Closing, the aggregate Purchase Price to be paid at the Closing shall be paid by cancellation of indebtedness pursuant to **Section 1(e).**

   (c) **Delivery.** Promptly following the Closing, the Company shall deliver to the Purchaser the Shares being purchased at the Closing, against payment of the aggregate Purchase Price therefor by check payable to the Company, by wire transfer of immediately available funds to a bank account designated by the Company, by cancellation or conversion of indebtedness or other convertible securities of the Company to Purchaser, or by any combination of such methods.

   (d) **Closing Conditions.**

      (i) Purchaser's obligation to purchase the Shares at the Closing is subject to the

satisfaction or waiver, at or prior to the Closing, of the following conditions:

(A) as of the Closing, the representations and warranties made by the Company in **Section 3** shall be true, complete, and correct in all material respects, and the Company shall have performed or observed all obligations and conditions herein required to be performed or observed by the Company on or prior to the Closing;

(B) as of the Closing, the sale and issuance of the Shares shall be legally permitted by all laws and regulations to which Purchaser is subject;

(C) the Shares shall have the rights, preferences, privileges, and restrictions set forth in the Certificate of Incorporation of the Company, in substantially the form attached hereto as **Exhibit A** (the "**Charter**"), as amended from time to time;

(D) the Company, Purchaser, and each other stockholder of the Company named as a party thereto shall have delivered a duly executed copy of the Stockholders' Agreement, in substantially the form attached hereto as **Exhibit B** (the "**Stockholders' Agreement**," and, together with this Agreement, the "**Financing Documents**").

(ii) The Company's obligation to sell and issue the Shares at the Closing is subject to the satisfaction or waiver, at or prior to the applicable Closing, of the following conditions:

(A) as of the Closing, the representations and warranties made by Purchaser in **Section 2** shall be true, complete, and correct in all material respects, and Purchaser shall have performed or observed all obligations and conditions herein required to be performed or observed by Purchaser on or prior to the Closing;

(B) as of the Closing, the sale and issuance of the Shares shall be legally permitted by all laws and regulations to which the Company is subject; and

(C) Purchaser and each other stockholder of the Company named as a party thereto shall have delivered a duly executed copy of the Stockholders' Agreement.

(e) **Cancellation of Indebtedness**. The Company and Purchaser hereby acknowledge and agree to the following:

(i) The Purchaser previously funded certain short term loans to the Company in the amounts and on the dates set forth on Schedule A attached hereto (collectively, the "**Loans**"). The Purchaser hereby represents and warrants to the Company that it is the sole owner of all right, title and interest in and to the Loans.

(ii) Upon the Closing, other than the Shares issued to Purchaser pursuant to this Agreement, the Purchaser shall not be entitled to any other payment of any kind in connection with the Loans, and the Loans and all rights, title and interest arising under the Loans, are hereby canceled, released, extinguished and of no further force or effect. Effective upon the Closing, the Purchaser waives (i) any and all demands, claims, suits, actions, causes of actions, proceedings, assessments and rights in respect of the each of the Loans or any related agreements, and (ii) any

rights arising from any past or present default or event of default under the Loans. The Purchaser shall accept the Shares to be delivered at the Closing in full satisfaction and accord of all amounts previously payable under the Loans, and the Purchaser hereby acknowledges and agrees that it shall have no further rights under the Loans.

2. **REPRESENTATIONS, WARRANTIES, AND COVENANTS OF PURCHASER.** Purchaser hereby represents, warrants, and covenants, as follows:

(a) **Organization.** Purchaser is, if an entity, duly formed and validly existing under the laws of its jurisdiction of incorporation, formation, or organization (as applicable), and has all requisite power, authority, and capacity to execute and deliver the Financing Documents and to perform its obligations hereunder and thereunder.

(b) **Authorization.** All action on the part of Purchaser and, if an entity, its board of directors, managers, trustees, or analogous governing body, and its shareholders, members, or other equity holders (including obtaining any applicable consents, permits, or waivers) necessary for the authorization, execution, and delivery of the Financing Documents and Purchaser's performance hereunder and thereunder, has been taken. The Financing Documents, when executed and delivered by Purchaser, will constitute valid and binding obligations of Purchaser, enforceable in accordance with their terms; except as such enforceability may be limited by (i) bankruptcy, insolvency, moratorium, or other similar laws of general application affecting or relating to the enforcement of creditors' rights generally; and (ii) by general principles of equity (collectively "**General Enforceability Exceptions**"), and, with respect to rights to indemnity, subject to state and federal securities laws.

(c) **No Conflicts; No Third-Party Consents.** The execution, delivery, and performance of the Financing Documents by Purchaser do not (i) violate or conflict with any provision of the articles of incorporation, bylaws, or other governing documents, of Purchaser; (ii) violate applicable law; or (iii) conflict with or result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default under, any of the terms, conditions, or provisions of any contract or other obligation of Purchaser, and no authorization, approval, order, license, permit, franchise, or consent of, and no registration, declaration, or filing with, any governmental body or any other third party is required in connection with Purchaser's execution, delivery, and performance of the Financing Documents.

(d) **Access to Information.** Purchaser is in a position, based upon employment, personal relationship, economic bargaining power, or other factors, to obtain sufficient information to evaluate the risks and merits of Purchaser's investment in the Shares and the shares of the Company's common stock ("**Common Stock**") issuable upon conversion of the Shares (the "**Conversion Shares**," together with the Shares, the "**Securities**"). Purchaser acknowledges that Purchaser has had the reasonable opportunity to ask questions of and receive answers from the Company concerning the terms and conditions of Purchaser's investment in the Securities and the business operations and financial condition of the Company, and to obtain any additional information concerning the Company. Purchaser has received all information that Purchaser deems necessary to reach an informed and knowledgeable decision to acquire the Securities.

(e) **No Reliance.** Purchaser has not received and has not relied on any offering

2693777v.1

Exhibit 12
Page 3 of 19

materials other than this Agreement and has not relied on any information not contained in this Agreement. Purchaser has not relied (and will not at any time rely) on any communication (whether written or oral) by the Company or any of its directors, officers, managers, employees, agents, or affiliates, as investment advice or as a recommendation to purchase the Securities. Purchaser understands and acknowledges that any information or explanations related to the terms and conditions of the Securities provided by the Company or any of its directors, officers, managers, employees, agents, or affiliates, are not and shall not be deemed investment advice or a recommendation to purchase the Securities, and neither the Company nor any of its directors, officers, managers, employees, agents, or affiliates, has at any time acted as an advisor to Purchaser's investment decision. Neither the Company nor any of its directors, officers, managers, employees, agents, or affiliates, has (i) made any representation regarding the proper characterization of the Securities for purposes of determining the Purchaser's authority to invest in the Securities; (ii) made any representation or guarantee as to the potential success, return, effect, or benefit (whether legal, regulatory, tax, financial, accounting, or otherwise) of an investment in the Securities; or (iii) made any representation to Purchaser regarding the legality of an investment in the Securities and Purchaser's authority to invest in the Securities.

(f) **No General Solicitation or Advertising.** Purchaser acknowledges that neither the Company nor any other person has offered to sell the Securities to Purchaser by means of any form of general solicitation or general advertising, including but not limited to: (i) any advertisement, article, notice, or other communication published in any newspaper, magazine or similar media, or broadcast over television or radio; or (ii) any seminar or meeting whose attendees were invited by any general solicitation or general advertising.

(g) **Risk.** Purchaser understands and acknowledges that any investment in the Securities involves various risks, and that no federal or state agency has passed upon the merits or risks of an investment in the Securities or made any finding or determination concerning the fairness or advisability of Purchaser's investment. With the assistance of Purchaser's professional advisors, to the extent that Purchaser has deemed appropriate, Purchaser has made its own independent legal, tax, accounting, and financial evaluation of the merits and risks of an investment in the Securities and the consequences of this Agreement. Purchaser has considered the suitability of the Securities as an investment in light of Purchaser's own circumstances and financial condition has determined that Purchaser is able to bear the risks associated with an investment in the Securities, including the risk of total loss.

(h) **Accredited Investor Status.** Purchaser is an "accredited investor" as defined in Rule 501(a) of Regulation D ("**Regulation D**") under the Securities Act of 1933 (the "**Securities Act**"; an "**Accredited Investor**"). Purchaser agrees to furnish any additional information requested by the Company or any of its directors, officers, managers, employees, agents, or affiliates, to ensure compliance with applicable U.S. federal and state securities laws, including Regulation D and the Securities Act ("**U.S. Securities Laws**") in connection with the purchase and sale of the Securities.

(i) **Preexisting Relationship; Purchaser's Expertise.** Purchaser has either (i) preexisting personal or business relationships with the Company or one or more of its directors,

4

officers, managers, partners, or controlling persons, or (ii) the capacity to protect Purchaser's own interests in connection with the purchase of the Securities by virtue of the business or financial expertise of Purchaser or of professional advisors to Purchaser who are unaffiliated with, and who are not compensated by, the Company or any of its affiliates, directly or indirectly.

(j) **Private Placement.** Purchaser is purchasing the Securities for investment for Purchaser's own beneficial account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of applicable U.S. Securities Laws (including Section 25102(f) of the California Corporations Code, as amended). Purchaser understands and acknowledges that the Securities have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the *bona fide* nature of Purchaser's investment intent as expressed herein and Purchaser's representations, warranties, and covenants contained in this Agreement, upon which the Company is relying.

(k) **Restricted Securities.** Purchaser understands and acknowledges that the Securities are "restricted securities" under applicable U.S. Securities Laws and that the Securities Act and the rules of the U.S. Securities and Exchange Commission (the "**SEC**") provide in substance that Purchaser may dispose of the Securities only pursuant to an effective registration statement under the Securities Act or an exemption therefrom. Purchaser understands that the Company has no obligation or intention to register any of the Securities, or to take any action so as to permit sales pursuant to the Securities Act (including Rule 144 thereunder). Purchaser is familiar with Rule 144, which, in substance, permits limited public resale of "restricted securities" acquired directly or indirectly from the issuer thereof (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions, including: (i) the availability of certain public information about the Company and (ii) the resale occurring following the required holding period after Purchaser has purchased, and made full payment of (within the meaning of Rule 144), the securities to be sold. Purchaser further understands and acknowledges that at the time Purchaser wishes to resell the Securities there may be no public market in which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Purchaser would be precluded from selling the Securities under Rule 144 even if the minimum holding period requirement had been satisfied. Consequently, Purchaser understands that the Purchaser must bear the economic risks of the investment in the Securities for an indefinite period of time.

(l) **Acknowledgement of Restrictions.** Purchaser acknowledges and agrees that the Securities are subject to restrictions on transfer set forth in **Section 4** and in the Stockholders' Agreement. In the event of any conflict between **Section 4** and in the Stockholders' Agreement, the terms and provisions of the Stockholders' Agreement shall control.

(m) **Applicable Foreign Laws.** If Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended (the "**Code**")), Purchaser hereby acknowledges and agrees that Purchaser is responsible for complying with any non-U.S. securities laws applicable to the sale and issuance of the Securities, which are governed by U.S. Securities Laws. Purchaser has satisfied itself as to the full observance of the laws of its jurisdiction in connection with this Agreement and the sale and issuance of the Securities, including (i) all legal requirements within its jurisdiction for the sale and issuance of the Securities,

(ii) any foreign exchange restrictions applicable to such sale and issuance, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the sale and issuance, holding, redemption, sale, or transfer of the Securities.  The Company's offer of the Securities and the parties' execution and delivery of this Agreement, and payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Purchaser's jurisdiction.  Furthermore, Purchaser shall, at Purchaser's sole expense, defend the Company and its Affiliates, and each of the Company's and its Affiliates' respective officers, directors, employees, agents, successors and assigns (each an "**Indemnified Party**") against any claim, suit, or action to the extent such claim, suit, or action arises or results from or relates to any violation by the Company or Purchaser of non-U.S. securities laws in connection with the sale and issuance of the Securities to Purchaser (each an "**Foreign Securities Law Claim**").  Purchaser shall indemnify and hold harmless each Indemnified Party against and shall pay all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder, and the cost of pursuing any insurance providers arising or resulting from any Foreign Securities Law Claim.

(n) **Understanding; Advice of Counsel.**  Purchaser has reviewed the Financing Documents in their entirety, has had an opportunity to obtain the advice of counsel prior to executing the Financing Documents, and fully understands all provisions of the Financing Documents.

(o) **Accuracy of Address.**  If Purchaser is an individual, then Purchaser resides in the state or province identified in the address of Purchaser set forth on the signature page hereto; if Purchaser is a partnership, corporation, limited liability company or other entity, then the office or offices of Purchaser in which its investment decision was made is located at the address or addresses of Purchaser set forth on the signature page hereto.

(p) **"Bad Actor" Status.**  Purchaser hereby represents that neither it nor any of its Rule 506(d) Related Parties is a "bad actor" within the meaning of Rule 506(d) of Regulation D.  As used in this Agreement, "**Rule 506(d) Related Party**" means a person or entity covered by the "Bad Actor disqualification" provision of Rule 506(d) of Regulation D.

(q) **Broker's Fees.**  No agent, broker, investment banker, person, or firm acting on behalf of or under the authority of Purchaser is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the purchase and sale of the Securities.  Purchaser further agrees to indemnify the Company from and against any losses or expenses incurred by the Company as a result of any inaccuracy or breach of this subsection.

3. **REPRESENTATIONS AND WARRANTIES OF THE COMPANY.**  The Company hereby represents and warrants to Purchaser that, except as set forth on the Disclosure Schedule attached hereto as **Exhibit C** (the "**Disclosure Schedule**"), each of the following statements is true and correct as of the Closing Date:

(a) **Organization.**  The Company is a corporation duly incorporated, validly existing, and in good standing under the laws of the State of Delaware.  The Company has all requisite

6

corporate power and authority to own, operate, or lease its properties and assets; to carry on its business as it is currently conducted; and to perform its obligations under the terms of the Financing Documents, including selling and issuing the Securities. The Company is duly qualified and in good standing as a foreign corporation authorized to do business in each jurisdiction in which the nature of its business, properties, or assets requires such qualification, except where the failure to be so qualified would not reasonably be expected to have a material adverse effect on the Company.

(b)  **Authorization.**  All corporate action on the part of the Company, its officers, directors, and stockholders (including the obtainment of any consents, permits, or waivers) necessary for the authorization, execution, and delivery of the Financing Documents and the Company's performance hereunder and thereunder (including the sale, issuance, and delivery of the Securities) has been taken or will be taken prior to the Closing. The Financing Documents, when duly executed and delivered by the Company, will constitute valid and binding obligations of the Company enforceable in accordance with their terms, except as such enforceability may be limited by General Enforceability Exceptions.

(c)  **No Conflicts.**  The execution, delivery, and performance by the Company of the Financing Documents does not violate, conflict with, constitute or result in a breach, violation, or default under (or an event that with notice or passage of time, or both, would constitute a breach, violation, or default), or give rise to any right of termination, cancellation, or acceleration under, or result in the creation of any Encumbrance upon any properties or assets of the Company under: (i) any provision of the Charter or the Company's bylaws ("**Bylaws**"); (ii) any applicable law, statute, rule or regulation, or any ruling, writ, injunction, order, judgment or decree of any court, arbitrator, administrative agency, or other governmental body applicable to the Company or any of its properties or assets; or (iii) any contract or agreement to which the Company is party; *except*, with respect to clauses (ii) and (iii), where such violation, conflict, breach, default, termination, cancellation, acceleration, or Encumbrance would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the Company. As used herein, the term "**Encumbrance**" means any lien, charge, encumbrance, equity, claim, option, proxy, pledge, security interest, or other similar right of any nature other than statutory liens securing payments not yet due and payable or due but not yet delinquent. The sale of the Securities pursuant to this Agreement is not, and will not be, subject to any preemptive rights or other rights of first refusal that have not been properly waived or satisfied on or prior to the Closing.

(d)  **Capitalization.**  The authorized capital stock of the Company, as of immediately prior to the Closing, will consist of (i) 11,000,000 shares of Common Stock, par value $0.001 per share, 8,249,999 shares of which will be issued and outstanding; and (ii) 1,313,008 shares of Series Seed Preferred, par value $0.001 per share, 916,667 shares of which will be issued and outstanding. Except pursuant to the Financing Documents, or as set forth in **Section 3(d)** of the Disclosure Schedule, other than shares otherwise included in the calculation of issued and outstanding Common Stock above, there are no outstanding options, warrants, or other rights for the purchase or acquisition from the Company of the Company's equity securities. When issued in compliance with the provisions of this Agreement and the Charter, the Securities will be validly issued, fully paid and non-assessable, and except as set forth in the Financing Documents, will be free of any Encumbrances, other than any right of first refusal set forth in the Bylaws or any Encumbrance imposed upon Purchaser; *provided*, however, that the Securities may be subject to restrictions on

transfer under state and/or federal securities laws as set forth herein or as otherwise required by such laws at the time a transfer is proposed. The Securities shall have the rights, preferences, privileges, and restrictions set forth in the Charter, as amended from time to time.

(e) **Registration Rights and Voting Rights**. Except as set forth in the Financing Documents, the Company is presently not under any obligation, and has not granted any rights, to register under the Securities Act any of the Company's presently outstanding securities or any of its securities that may hereafter be issued. Except as provided for in the Financing Documents, to the Company's knowledge, no stockholder of the Company has entered into any agreement with respect to the voting of equity securities of the Company.

(f) **Offering Valid**. Assuming the accuracy of Purchaser's representations and warranties contained herein, the offer, sale, and issuance of the Securities will be exempt from the registration requirements of the Securities Act and will have been registered or qualified (or will be exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws.

(g) **Financial Statements**. The Company has provided to Purchaser correct and complete copies of (i) the unaudited consolidated and separate balance sheets of the Corporation and any entity in which the Company owns greater than fifty percent (50%) of the issued and outstanding equity interests, specifically including Earth.com Inc., a Nevada corporation, in which the Corporation owns 100% of all issued and outstanding shares, and EarthSnap Inc., a Delaware corporation, in which the Corporation owns 100% of all issued and outstanding shares (each a "**Subsidiary**" and, collectively, the "Subsidiaries") as of June 30, 2021 (the "Latest Interim Balance Sheets"), and the related unaudited consolidated and separate statements of income and retained earnings and cash flows of the Company and its Subsidiaries for the period ended June 30, 2021 (collectively, with the Latest Interim Balance Sheets, the "Financial Statements"). Except as set forth in Section 3(g) of the Disclosure Schedule, the Financial Statements are based upon the books and records of the Company and its Subsidiaries and were prepared in accordance with the cash basis of accounting. The Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and the results of operations for the periods then ended subject to normal year-end adjustments.

(h) **Litigation**. Except as provided in Section 3(i) of the Disclosure Schedule, to the knowledge of the Company, there are no claims, actions, suits, proceedings, audits, investigations, inquiries, administrative enforcement proceedings or arbitration proceedings before any Governmental Authority ("**Proceedings**") pending or threatened: (a) against or affecting the Company or its Subsidiaries; or (b) that challenge, or question the validity of, this Agreement or any action taken or to be taken by the Company in connection with, or which seeks to enjoin or obtain monetary damages in respect of, the consummation of the transactions contemplated hereby.

(i) **Taxes**. The Company and its Subsidiaries have filed (taking into account any valid extensions) all material tax returns required to be filed by the Company and has paid all taxes shown to be due on such tax returns or otherwise due. Such tax returns are true, complete and correct in all material respects. The Company and its Subsidiaries are not currently the beneficiary of any extension of time within which to file any material tax return other than

8

extensions of time to file tax returns obtained in the ordinary course of business, and there has been no waiver or extension of any applicable statute of limitations for the assessment or collection of any taxes potentially due by the Company or its Subsidiaries. All material taxes due and owing by the Company and its Subsidiaries have been paid or accrued. There is no pending or, to the Knowledge of the Company (which shall mean the actual knowledge of Eric Ralls), threatened action, audit, proceeding or investigation for the assessment or collection of any taxes potentially due by the Company. No power of attorney has been granted by the Corporation with respect to any matter relating to taxes. The Company and its Subsidiaries have properly paid any taxes due resulting from any erroneous S-Corporation election by a Subsidiary.

(j)     **Title to Assets**.  The Company and its Subsidiaries have good and valid title to, a valid leasehold interest in, or valid license to use all of the tangible and intangible property and assets used in the operation of their businesses, free and clear of all Liens. Section 3(k) of the Disclosure Schedule sets forth a true and complete list of all property owned by the Company and its Subsidiaries, free and clear of all Liens. Except as described in the Section 3(k) of the Disclosure Schedule, there are no developments affecting the owned or leased properties or assets of the Company or its Subsidiaries that could detract from the value of such property or assets, interfere with any present or intended use of any such property or assets, or adversely affect the marketability of any such properties or assets.

(k)     **Intellectual Property**.  To its knowledge, the Company owns or possesses sufficient legal rights to all patents, trademarks, service marks, tradenames, copyrights, trade secrets, licenses, information and proprietary rights and processes necessary for its business without any conflict with, or infringement of, the rights of others. The Company has not received any communications alleging that the Company has violated or, by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets or other proprietary rights or processes of any other person or entity.  The Company is not aware that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of such employee's best efforts to promote the interest of the Company or that would conflict with the Company's business.  Neither the execution or delivery of this Agreement, nor the carrying on of the Company's business by the employees of the Company, nor the conduct of the Company's business as proposed, will, to the Company's knowledge, conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such employee is now obligated.  The Company does not believe it is or will be necessary to use any inventions of any of its employees (or persons it currently intends to hire) made prior to their employment by the Company.  The Company has not embedded any copy left open source code in any of its distributed products, including but not limited to any GNU or GPL libraries or code.

(l)     **Broker's Fees**.  No agent, broker, investment banker, person, or firm acting on behalf of or under the authority of the Company is or will be entitled to any broker's or finder's fee or any other commission directly or indirectly in connection with the purchase and sale of the Securities.  The Company further agrees to indemnify Purchaser from and against any losses or expenses incurred by Purchaser as a result of any inaccuracy or breach of this subsection.

2693777v.1

Exhibit 12
Page 9 of 19

4. **RESTRICTIONS ON TRANSFER.**

(a) **General Restrictions.**  In addition to any other restrictions on transfer under any other agreement to which Purchaser is a party or to which the Shares are subject, Purchaser shall not sell, assign, pledge, encumber, hypothecate, exchange, transfer, convey, grant any option for the purchase of, enter into any hedging or similar transaction with the same economic effect as a sale, or otherwise dispose of any interest in, whether voluntary or by operation of law, in trust, gift, transfer by request, devise or descent, directly or indirectly ("**Transfer**"), or make any offer or attempt to Transfer, any Shares unless and until:

(i) there is then in effect a registration statement under the Securities Act covering such proposed Transfer and such Transfer is made in accordance with such registration statement; or

(ii) (A) the transferee has agreed in writing to be bound by the terms of this Agreement, (B) Purchaser has notified the Company of the proposed Transfer and has furnished the Company with a detailed statement of the circumstances surrounding the proposed Transfer, (C) such Transfer is made in accordance with the provisions of the Company's Bylaws, and (D) if reasonably requested by the Company, Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such proposed Transfer will not require registration of such Shares under the Securities Act.

(b) **Market Standoff.**  Purchaser shall not Transfer (including making any short sale of) any Common Stock or other securities of the Company held by Purchaser, including the Securities (the "**Lock-Up Shares**"), during the 180-day period following the effective date of a registration statement under the Securities Act covering such Lock-Up Shares, or such longer period (not to exceed 18 days after the expiration of the 180-day period, as the underwriters or the Company shall request in order to facilitate compliance with FINRA Rule 2241) (the "**Lock-Up Period**").  Purchaser agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriter that are consistent with the foregoing or that are necessary to give further effect thereto.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to Purchaser's Lock-Up Shares until the end of the Lock-Up Period. The underwriters of the Lock-Up Shares are intended third party beneficiaries of this **Section 4(b)** and shall have the right, power, and authority to enforce the provisions hereof as though they were a party hereto.

(c) **Attempted Transfer in Violation.**  Any purported Transfer in violation of this Agreement shall be void *ab initio* and without effect, and the Company shall not be required (i) to transfer on its books any Securities that are purported to have been Transferred in violation of this Agreement or (ii) to treat any individual or entity to whom such Securities are purported to have been Transferred as the owner of such Securities, to accord such individual or entity any right to vote as the owner of such Securities, or to pay dividends or otherwise make any distributions to such individual or entity.

5. **RESTRICTIVE LEGENDS.**  All certificates representing the Securities shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties or by appropriate state "blue sky" securities

10

officials):

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION, AND MAY NOT BE OFFERED, SOLD, PLEDGED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO (A) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR (B) AN EXEMPTION FROM REGISTRATION UNDER THE ACT, IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE STATE SECURITIES LAWS AND THE SECURITIES LAWS OF OTHER JURISDICTIONS, AND IN THE CASE OF A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE ACT, UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE ACT AND SUCH OTHER APPLICABLE LAWS."

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY OR THE COMPANY'S ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE COMPANY."

6. **GENERAL.**

(a) **Governing Law.** The Financing Documents and any claim (whether in contract, tort or otherwise) or other matter arising out of or relating to the Financing Documents or the transactions contemplated hereby or thereby shall be governed by and construed in accordance with the laws of the state of Delaware, without giving effect to any choice or conflict of law principle or rule (whether of the state of Delaware or any other jurisdiction).

(b) **Severability.** If any term or provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable ("**Invalid**") in any jurisdiction, then such term or provision will be interpreted in such jurisdiction so as to accomplish its objectives to the greatest extent possible under applicable law; *provided*, that the Invalid term or provision will not affect any other term or provision of this Agreement or cause the term or provision to be Invalid in any other jurisdiction.

(c) **Notices.** All notices required or permitted by this Agreement shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the recipient; (ii) when sent by confirmed facsimile or electronic mail during normal business hours of the recipient, and if not sent during normal business hours of the recipient, then on the next business day; (iii) five calendar days after having been sent by registered or certified mail, with return receipt requested and postage prepaid; or (iv) one business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company, at:

    Digital Earth Media Inc.
    473 West Colorado Ave

> Telluride, CO 81435-3740
> Email: ralls@earth.com
> Attn: Eric Ralls

and to Purchaser at the address set forth on the signature page hereof, or to such other address or to the attention of such other person as the recipient has specified by ten days' prior written notice to the sender.

(d)     **Amendment and Modification; Waiver.**  This Agreement and the rights of the Purchaser may be amended, modified, or terminated only upon the written consent of (i) the Company and (ii) the Purchaser.  The obligations of the Company under this Agreement may be waived or terminated upon the written consent of Purchaser.  No waiver of any provision of this Agreement is effective unless it is in writing, identified as a waiver to this Agreement, and is signed by the party waiving its right.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from the Financing Documents shall operate or be construed as a waiver thereof; nor shall any single or partial waiver or exercise of any right, remedy, power, or privilege hereunder or thereunder preclude or limit any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(e)     **Successors and Assigns.**  Except as otherwise expressly provided herein, and subject to the restrictions on transfer set forth herein, this Agreement shall inure to the benefit of and be binding upon the parties' respective permitted successors and permitted assigns.  Any attempted assignment or delegation in violation of this Agreement shall be void and without effect.

(f)     **Further Assurances.**  From and after the Closing, each party shall, and shall cause its respective affiliates to, from time to time and at the request and sole expense of the other party furnish each other party such further information or assurances, execute and deliver to each other party such other documents, and shall take such other actions as such other party may reasonably request for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement, and to obtain any governmental approval in connection with, or otherwise qualify, the issuance of the Securities.

(g)     **Expenses.**  Except as otherwise expressly provided in this Agreement, all fees, costs, and expenses incurred in connection with the negotiation, execution, delivery, and performance of this Agreement and the agreements and transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing has occurred.

(h)     **Attorneys' Fees.**  In any action to interpret or enforce any provision of this Agreement, the prevailing party will be entitled to recover from the non-prevailing party its reasonable attorneys' fees, costs, and other expenses, including fees and costs for expert witnesses, incurred in connection with such action.

(i)     **Entire Agreement.**  The Financing Documents, the exhibits, schedules, and attachments hereto and thereto, and the agreements expressly referenced herein and therein, each of which is incorporated herein, collectively constitute the entire agreement between the parties with respect to the subject matter hereof, and supersede and merge all prior and contemporaneous agreements, understandings, or representations, whether written or oral.

(j)     **Interpretation.**  The headings used in this Agreement are for informational purposes and convenience only and in no way define, limit, construe, or describe the scope of the sections.  Unless the context otherwise requires, (i) each term stated in either the singular or the plural shall include the singular and the plural, (ii) the words "herein," "hereof," or any variation thereof refer to this Agreement as a whole and not merely to any subdivision hereof, and (iii) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any preceding general statement.  The parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arise, no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(k)     **Counterparts; Electronic Delivery.**  This Agreement may be executed in one or more counterpart(s), each of which shall be deemed an original and all of which shall be deemed one and the same instrument.  Delivery of an executed counterpart to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually executed counterpart to this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit 12
Page 14 of 19

    **IN WITNESS WHEREOF**, the undersigned have executed this **SERIES SEED PREFERRED STOCK SUBSCRIPTION AGREEMENT** as of the Effective Date.

| ACCEPTED: | PURCHASER: |
|---|---|
| **DIGITAL EARTH MEDIA INC.** | |
| | **HI INVESTMENTS, LLC** |
| By: *Eric Ralls* (DocuSigned by: 5A622D1FBC804B7...) | By: *Vernon Decossas* (DocuSigned by: 862385ECE81C442...) |
| Name: Eric Ralls | Name: Vernon Decossas |
| Title: President | Title: Manager |
| | Date: April 19, 2022 |
| | Address: 1315 Oakfield Drive, Suite 2817 |
| | Brandon, FL 33509 |
| | Telephone: 8138573433 |
| | Email: bdecossas@dnc.io |

# SCHEDULE A

# LOANS

| Date of Loan | Loan Amount |
|---:|---:|
| 2/18/2022 | $50,000.00 |
| 3/2/2022 | $146,600.00 |
| 3/11/2022 | $43,000.00 |
| 3/17/2022 | $23,440.00 |
| 3/18/2022 | $20,000.00 |
| 3/22/2022 | $37,000.00 |
| 3/25/2022 | $4,960.00 |
| **Total:** | **$325,000.00** |

# EXHIBIT A

## CERTIFICATE OF INCORPORATION

# EXHIBIT B

## STOCKHOLDERS' AGREEMENT

## EXHIBIT C

## DISCLOSURE SCHEDULE

None.

2693777v.1

Exhibit 12
Page 19 of 19