# EXHIBIT 15

# CHANNEL PARTNER AGREEMENT

THIS CHANNEL PARTNER AGREEMENT ("**Agreement**") is dated June 27, 2022 ("**Effective Date**") between and **HI INVESTMENTS, LLC**, a Delaware limited liability company, with its principal place of business at 1315 Oakfield Drive, Suite 2817, Brandon, FL 33509 ("**Channel Partner**"), and between **Earth.com Inc.,** a Delaware corporation with its principal place of business at 473 West Colorado Ave., #3740, Telluride, CO, 81435 ("**Company**"). Company is an online audio and video media provider that sources information though an online information platform through one or more websites and/or other electronic media distribution channels. This Agreement sets forth the terms and conditions under which Channel Partner may promote and assist Company in the sale of Company's products and services, inclusive of digital advertising space on Company's online platforms (the "**Company Services**"). The parties agree as follows:

1.      **SERVICES.**

1.1      **Referral Services.** Subject to the terms of this Agreement, Company appoints and authorizes Channel Partner to promote and market the Company Services, on a non-exclusive basis, to potential Customers who are Channel Partner's customers or potential customers.  As used in this Agreement, "**Customer**" means any person or entity that Channel Partner refers to Company to purchase Company Services.  During the Term (as defined below) Channel Partner may promote Company Services to potential Customers.  Channel Partner shall provide Company with the name and contact information (*e.g.*, email address or phone number) of an individual at such potential Customer (a "**Lead**") and, at Company's request, Channel Partner will facilitate an introduction between Company and such potential Customer, whether by email, meeting, conference call, or other means of communication (an "**Introduction**").  Channel Partner shall notify Company in writing of each potential Customer that Channel Partner intends to pursue as soon as reasonably practicable, which notice shall contain sufficient information as Company may request to verify any potential conflict or duplication of efforts in respect of the foregoing.  At Company's request, Channel Partner shall provide reasonable assistance to Company in selling the Company Services to such potential Customer, including through facilitating communications between Company and such potential Customer.

1.2      **Consulting Services.**  From time to time, Company may request Channel Partner to provide certain consulting and advisory services relating to the optimization of company revenue and other areas relating to Company's business.  Channel Partner shall, as reasonably requested, attend meetings or otherwise provide equivalent services to the Company remotely, via e-mail, teleconference, or videoconference.

1.3      **Channel Partner' Performance.** Channel Partner shall at all times: (a) conduct its business, including the performance of its duties under this Agreement in a competent and professional manner that reflects favorably on the goodwill and reputation of Company; (b) not make any false or misleading statements with regard to Company or to the Company Services; (c) not make any representations, warranties, or guarantees relating to Company or the Company Services, other than representations, warranties, or guarantees made by Company in any Marketing Materials (as defined below) or posted by Company on Company's publicly accessible website; and (d) comply with all applicable federal, state, regional, and local laws and regulations, in any and all jurisdictions, applicable to Channel Partner related to the performance of its duties under this Agreement.

1.4      **Discontinuation of Offering.** In the event that Company discontinues general availability of any Company Services, Company, and Channel Partner shall no longer promote or market such Company Service following notification to Channel Partner of such discontinuance.

1.5      **Materials.** Company may provide or make available to Channel Partner appropriate sales and marketing materials for each of the Company Services (including service descriptions) ("**Marketing Materials**").  Company hereby grants Channel Partner a limited and non-exclusive license during the Term: (a) to reproduce, distribute, and publicly display the Marketing Materials; and (b) to use Company's corporate name and trademarks associated with the Company Services to accurately identify and refer to Company and the Company Services in connection with Channel Partner' performance under this Agreement; *provided* that (i) such use is not likely to cause confusion about the source of the Company Services or Company's relationship with Channel Partner, and (ii) Channel Partner' use is in compliance with Company's usage guidelines, as provided to Channel Partner in writing.

1.6      **Independent Contractors.** The relationship of the parties is that of independent contractors. Nothing in this Agreement is intended to, or should be construed to, create a partnership, joint venture, or employer-employee relationship between Channel Partner and Company or any of Company's employees, contractors, agents, or representatives. Channel Partner may represent itself as an authorized agent of the Company Services, provided that, except as expressly set forth in this Agreement, neither party, nor any of its employees, contractors, agents, or representatives, are agents of the other party or are

2844092v.1

Exhibit 15
Page 1 of 6

authorized (and shall not represent to any third party any of them is so authorized) to make any commitment or otherwise act on behalf of the other party.

**1.7    Audit.** Each party shall retain reasonable and appropriate records with respect to each Customer and Customer Fees (including, at least, copies of each such Customer Orders and any related agreements, amendments, or waivers, and all associated accounting records) ("**Customer Records**") during the term of this Agreement and for at least 1 year thereafter. During the Term and for a period of 1 year thereafter, (a) upon request, each party shall provide or make available to the requesting party any or all Customer Records (in paper or electronic format) as requested by the requesting party; and (b) a requesting party will have the right, at its expense, on 5 business days' advance notice and during  the non-requesting party's business hours, to examine the non-requesting party's books and records at the non-requesting party's offices to verify the non-requesting party's compliance with the terms and conditions of this Agreement.

**2.    FEES AND PAYMENTS.**

**2.1    Customer Fees.**  Customer fees for Company Services shall be calculated on a Cost Per Thousand basis (CPM) ("**Customer Fees**"). The minimum or maximum rate for Customer Fees for Company Services that Channel Partner may promote and offer Customers shall be determined by the Company from time to time and communicated to Channel Partner in writing. Customer Fees are any and all advertising revenues collected by the Company from any sources, including, but not limited to all fees collected from Customers for Company Services.

**2.2    Channel Partner Fees; Payment Terms.** As full and complete consideration for Channel Partner's services as provided under this Agreement, during the term of this Agreement Channel Partner shall be entitled to an amount equal to 75% of the Company's Monthly Advertising Profit for the preceding month, not to exceed $1,206,500 (the "**Channel Partner Fee**"). "**Monthly Advertising Profit**" for the purposes of this Agreement shall mean Company's advertising revenue generated from Customer Fees, less all operational costs and expenses in respect thereof ("**Costs**"); *provided that*, such for the purposes of determining the Monthly Advertising Profit, Costs, exclusive of server fees, shall not exceed $10,000 per month. Payment of Channel Partner Fees shall be contingent upon Company's receipt of Customer Fees due. Payment shall be in U.S. Dollars. Company shall deliver to Channel Partner a monthly statement of Costs, in reasonable detail sufficient for Company and Channel Partner to calculate Monthly Advertising Profit.  Each party's books and records shall be subject to inspection and audit by the other party, at reasonable times and upon reasonable prior written notice to such party, in each case to the extent reasonably necessary to confirm and ensure complete and accurate accounting with respect to the calculation of Customer Fees and Monthly Advertising Profit.  In the event of any dispute as to the calculation of Costs and Monthly Advertising Profit, the parties shall negotiate in good faith to resolve such disputes.

**2.3    Payment Forwarding**. Unless otherwise requested by any Customer, the Company shall list Channel Partner as the payment agent for all Customer Fees for Customers referred by Channel Partner to be invoiced by Company but paid directly by Customer to Channer Partner. If Channel Partner receives payment of any Customer Fees, Channel Partner shall promptly forward the Customer Fees, less the amount of any outstanding Channel Partner Fees, to the Company.

**3.    CONFIDENTIALITY.**

**3.1    Confidential Information.** Each party (the "**Recipient**") acknowledges that it will have access to and will be exposed to Confidential Information of the other party (the "**Disclosing Party**") in connection with this Agreement and the parties' relationship hereunder. As used in this Agreement, "**Confidential Information**" means any and all data, documents, materials, and other information, whether in tangible or intangible form, that relates to the business of Discloser or any of Discloser's affiliates or representatives and is identified or referred to as "confidential" or "proprietary" (or any equivalent term) or that Recipient otherwise knows or would reasonably be expected to know (due to the nature of the subject matter or the circumstances surrounding such information's disclosure) that Discloser or any of Discloser's affiliates or representatives considers to be proprietary or confidential; including, without limitation: (a) the specific terms of this Agreement (but not its existence and scope); (b) all Discloser intellectual property disclosed or made available to Recipient; and (c) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations and other materials prepared by or for Recipient or its affiliates or representatives that contain, are based on, or otherwise reflect or are derived from any Confidential Information, in whole or in part.

**3.2    Exclusions.** "**Confidential Information**" does not include information that Recipient can demonstrate by clear and convincing documented evidence: (a) was publicly available at the time it was communicated to Recipient; (b) becomes publicly available after it was communicated to Recipient through no breach of this Agreement by Recipient (or of any other agreement between Discloser and Recipient); (c) was in Recipient's possession without any restrictions on use or disclosure prior to Recipient's receipt of such information directly or indirectly from or on behalf of Discloser or its affiliates or representatives; (d) was previously, or is subsequently, independently developed by Recipient or Recipient's employees or independent contractors without access or reference to, or use of, any Confidential Information; or (e) is subsequently received

2844092v.1

Exhibit 15
Page 2 of 6

by Recipient from a third party that was not, at the time, under any obligation to Discloser or its affiliates or representatives, to maintain the confidentiality of such information.

**3.3** **Nondisclosure; Restricted Use; Duty of Care.** Recipient will, at all times and notwithstanding any termination or expiration of this Agreement: (a) hold in the strictest confidence and not disclose, communicate, or make available (or permit to be disclosed, communicated, or made available) to any person or entity any of Discloser's Confidential Information without Discloser's prior written consent; except to those Recipient employees, agents, or representatives with a need to know and which have signed written confidentiality Agreements containing, or are otherwise bound by, confidentiality obligations at least as restrictive as those contained herein; (b) not use Discloser's Confidential Information, except to the extent necessary to exercise Recipient's rights and to perform its obligations under this Agreement; (c) protect and prevent the unauthorized disclosure or misuse of the Confidential Information by measures at least as restrictive as the measures it uses to protect its own Confidential Information, but with no less than a reasonable standard of care; and (d) immediately notify Discloser upon discovery of any loss or unauthorized access to or disclosure of Discloser's Confidential Information. Recipient shall be responsible and liable for, and shall be deemed to have taken or omitted, any action or omission by Recipient's or Recipient's affiliates' employees, agents, representatives, or subcontractors that would, if such act or omission were taken or omitted by Recipient, constitute a breach of this section.

**3.4** **Permitted Disclosures.** Notwithstanding the foregoing, Recipient may disclose Confidential Information without Discloser's prior written consent to the extent: (a) necessary for Recipient to enforce its rights hereunder; (b) as required for each party to perform its obligations hereunder; or (c) required by applicable law or regulation or pursuant to a valid order of a court of competent jurisdiction or an authorized government agency; *provided*, that such disclosure does not exceed the minimum scope of disclosure required by such law, regulation, or order; and *provided further*, that Recipient provides at least five business days' prior written notice of any such required disclosure to Discloser stating nature and scope of the required disclosure, the reasons that such disclosure is required by law, and the time and place that such disclosure will be made, and in any event with sufficient prior notice to permit Discloser to contest the order or seek confidentiality protections, as determined in Discloser's sole discretion.

**3.5** **Reverse Engineering.** Recipient will not attempt to reverse engineer, decrypt, or otherwise derive the design, internal logic, structure, or inner workings (including algorithms and source code) of any software, product, model, prototype, or other item provided by Discloser that uses, embodies, or contains Confidential Information, including, without limitations any Company Intellectual Property.

**3.6** **Injunctive and Equitable Relief.** The parties acknowledge the unique and trade secret nature of Discloser's Confidential Information and Discloser's valuable intellectual property rights and other proprietary interest therein. The parties understand and agree that monetary damages, and Discloser's other remedies at law, will be inadequate, and that Discloser shall accordingly be entitled to injunctive and other equitable relief in any courts of competent jurisdiction to restrain the breach or threatened breach of, or otherwise to specifically enforce, any of the terms of this section, without the requirement of posting bond, and in addition to all other remedies available to Discloser at law, in equity, or hereunder.

**3.7** **Removal; Return; Survival.** Upon any termination or expiration of this Agreement, or upon Discloser's earlier request, Recipient will promptly (a) return to Discloser or, if so directed by Discloser, destroy all tangible embodiments of the Confidential Information (in every form and medium); (b) permanently erase all electronic files containing or summarizing any Confidential Information; and (c) certify to Discloser in writing that Recipient has fully complied with the foregoing obligations.

**4.** **INTELLECTUAL PROPERTY**

**4.1** **Ownership**. As between Company and Channel Partner, Company owns and retains all right, title, and interest, including, without limitation, all Intellectual Property Rights, in and to the Company Services and all intellectual property or other technology provided or used by Company in connection with the Company Services, or otherwise associated with any Company Services, including, without limitation, the Marketing Materials (collectively, "**Company Intellectual Property**"). Except as set forth in Section 1.5, this Agreement does not assign to or grant Channel Partner any right, title, interest, or license, whether by implication, estoppel, or otherwise, in or to the any Company Intellectual Property. For the avoidance of doubt, all intellectual property conceived, created, developed, or reduced to practice by Company or its employees, contractors, or agents, before, on, or after the Effective Date (including in connection with delivering the Company Services), is Company Intellectual Property. "**Intellectual Property Rights**" means all past, present, and future rights in or relating to intellectual property that may exist or be created under the laws of any jurisdiction in the world (including all rights accruing by virtue of treaties and conventions), including: (a) copyrights, exclusive exploitation rights, moral rights (including all rights of paternity, integrity, disclosure, and withdrawal), mask work rights, and other rights associated with works of authorship (including software, firmware, data, databases, and other data collections); (b) trademark, service mark, trade dress, trade name rights, and internet domain name registrations; (c) trade secret rights; (d) patent and industrial property rights; (e) all other proprietary rights in or

2844092v.1

Exhibit 15
Page 3 of 6

relating to, or forms of protection of, Intellectual Property (whether registered or unregistered); (f) all rights in or relating to applications for, and registrations, reissues, renewals, extensions, combinations, continuations (including continuations-in-part), reversions, restorations, recordations, and divisions of, any of the rights referred to in clauses (a) through (e) of this sentence; and (g) all rights in or relating to past, present, and future income, royalties, damages, and payments due with respect to any of the foregoing, including rights to damages and payments for past, present, or future infringements, misappropriations, or other violations thereof.

**4.2     Notice of Infringement**. Channel Partner shall notify Company of any known or reasonably suspected infringement or misappropriation of Company's Intellectual Property Rights. Channel Partner shall reasonably assist Company in pursuing Company's legal rights against any such infringers. Company, at its sole discretion, shall determine whether to pursue any particular case of infringement.

**4.3     Proprietary Markings and Copyright Notices**. Channel Partner shall not alter or remove any proprietary, confidentiality, trademark, service mark, copyright markings or notices, or any other marks or notices with respect to Intellectual Property Rights, placed upon or contained in any materials or documentation provided or made available by Company in connection with this Agreement.

**5.     WARRANTY DISCLAIMER.** EXCEPT AS SPECIFICALLY PROVIDED HEREIN, EACH PARTY EXPRESSLY DISCLAIMS ALL WARRANTIES OR CONDITIONS OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ALL IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, IN EACH CASE ARISING FROM OR RELATED TO THIS AGREEMENT.

**6.     LIMITATIONS OF LIABILITY.** EXCEPT WITH RESPECT TO (A) ANY BREACH OF SECTION 3 (CONFIDENTIALITY), (B) ANY BREACH OF SECTION 4 (INTELLECTUAL PROPERTY), OR (C) A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, A PARTY'S PAYMENT OBLIGATIONS WITH RESPECT TO SECTION 2 (THE "EXCLUSIONS"), TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL EITHER PARTY, ITS AFFILIATES, OR ANY OF SUCH PARTY'S OR ITS AFFILIATES' OFFICERS, EMPLOYEES, CONTRACTORS, PARTNERS, SUPPLIERS, OR AFFILIATES BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS INFORMATION, PROCUREMENT OF SUBSTITUTE GOODS AND/OR SERVICES, OR ANY OTHER PECUNIARY LOSS), WHETHER ARISING IN TORT (INCLUDING NEGLIGENCE), CONTRACT, STRICT LIABILITY, OR ANY OTHER LEGAL THEORY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT FOR THE EXCLUSIONS, AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, EACH PARTY'S MAXIMUM CUMULATIVE LIABILITY AND FINANCIAL RESPONSIBILITY FOR ANY OBLIGATIONS OR CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT WILL BE LIMITED TO THE AMOUNT OF CUSTOMER FEES ACTUALLY PAID TO COMPANY IN THE 6 MONTH PERIOD PRECEEDING THE ACCRUAL OF SUCH LIABILITY OR OBLIGATION, EVEN IF ANY REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE.

**7.     TERM AND TERMINATION.**

**7.1     Term and Termination.** Unless earlier terminated in accordance its terms, the term of this Agreement shall commence on the Effective Date will continue for one (1) year (the "**Initial Term**") and will automatically renew for successive additional one (1)-year periods (each a "**Renewal Term**," and together with the Initial Term, the "**Term**") unless Channel Partner, at it sole option, notifies the Company in writing of its intent not to renew at least thirty (30) days prior to the end of the Initial Term or the applicable Renewal Term.  Notwithstanding the foregoing, this Agreement shall automatically expire upon the Channel Partner's receipt of a cumulative Channel Partner Fee of $[$1,206,500].

**7.2     Termination.**

(a)     Channel Partner may terminate this Agreement at any time, for any reason or for no reason, upon ninety (90) days prior written notice to the other party. Each party waives any right it may have to receive any compensation or reparations on voluntary termination or expiration of this Agreement under the law of any jurisdiction, other than such compensation or reparations as may be expressly provided in this Agreement.

(b)     Either party may terminate this Agreement at any time on written notice to the other in the event of a material breach by the other party and a failure to cure such breach within thirty (30) days after receipt of written notice describing such breach in reasonable detail.

**7.3     Effect of Termination.** Notwithstanding any other provision of this Agreement, no expiration or termination of this Agreement shall discharge any obligation to make payments for any Customer Fees or Channel Partner Fees which have accrued prior to, or are due as, of the effective date of such expiration or termination.

2844092v.1

Exhibit 15
Page 4 of 6

DocuSign Envelope ID: D8BD943F-74F9-447C-AB29-AA9614FE8B85

**7.4     Survival.** No expiration or termination of this Agreement shall relieve either party of any obligation that accrued prior to the date of such expiration or termination. Notwithstanding anything else in this Agreement to the contrary, the provisions of Sections 2 (Referral Fees and Payments), 3 (Confidentiality) 4 (Intellectual Property), , 5 (Warranty Disclaimer), 6 (Limitations of Liability), 7.3 (Effect of Termination), 7.4 (Survival), and 8 (General) shall survive any expiration or termination of this Agreement.

**8.     GENERAL PROVISIONS.**

**8.1     Governing Law.** This Agreement and any claim (whether in contract, tort or otherwise) or other matter arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law principle or rule (whether of the State of Delaware or any other jurisdiction).

**8.2     Severability.** If any term or provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, or otherwise unenforceable ("**Invalid**") in any jurisdiction, then such term or provision shall deemed modified and shall be interpreted in such jurisdiction so as to accomplish its objectives to the greatest extent possible under applicable law; *provided*, that the Invalid term or provision will not affect any other term or provision of this Agreement or cause the term or provision to be Invalid in any other jurisdiction.

**8.3     Notices.** All notices required or permitted by this Agreement shall be in writing and shall be deemed effectively given; (a) upon personal delivery to the recipient; (b) when sent by confirmed facsimile or electronic mail during normal business hours of the recipient, and if not sent during normal business hours of the recipient, then on the next business day; (c) five (5) calendar days after being sent by registered or certified mail, with return receipt requested and postage prepaid; or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to each recipient at the following address (or at such other address or to the attention of such other person as the recipient may designate by ten days' advance written notice):

> **HI INVESTMENTS, LLC**
>
> HI INVESTMENTS, LLC,
> 1315 Oakfield Drive, Suite 2817
> Brandon, FL 33509
>
>
> **DIGITAL EARTH MEDIA, INC.**
> 473 West Colorado Ave., #3740
> Telluride, CO, 81435

**8.4     Amendment and Modification; Waiver.** No amendment to, or modification or rescission of, this Agreement is effective unless it is in writing and signed by each party. No waiver of any provision of this Agreement is effective unless it is in writing, identified as a waiver to this Agreement, and signed by the party waiving its right. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial waiver or exercise of any right, remedy, power, or privilege hereunder preclude or limit any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**8.5     Assignment; Successors and Assigns.** No party may assign any rights or delegate any obligations under this Agreement, whether voluntarily or involuntarily, including by change of control, operation of law (including merger, and regardless of whether such party is the surviving entity), or otherwise without the prior written consent of each other party, which may not be unreasonably conditioned, delayed, or withheld; *provided*, *however*, that notwithstanding the foregoing, either party may assign or transfer this Agreement to a successor to all of its business or assets to which this Agreement relates, whether by merger, sale of assets, sale of stock, reorganization, or otherwise. No assignment or delegation shall relieve the assigning or delegating party of any obligations hereunder. Except as otherwise expressly provided herein, and subject to the restrictions on transfer set forth herein, this Agreement shall inure to the benefit of and be binding upon each party's respective permitted successors and permitted assigns. Any attempted assignment or delegation in violation of this provision shall be void and without effect.

**8.6     Cumulative Remedies.** Except as expressly provided herein, the rights and remedies of each party under this Agreement are cumulative, and are in addition to, and not in substitution for, any other rights and remedies available at law, in equity, or otherwise.

**8.7     Entire Agreement.** This Agreement, the exhibits, schedules, and attachments hereto, and the agreements expressly referenced herein, including all Orders, each of which is incorporated herein, collectively constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes and merges all prior and contemporaneous agreements, understandings, or representations, whether written or oral. No terms or conditions proposed by either party shall be binding on the other party unless expressly accepted in writing by both parties, and each party hereby objects to and rejects all terms and conditions not so expressly accepted.

**8.8     Interpretation.** The headings used in this Agreement are for informational purposes and convenience only and in no way define, limit, construe, or describe the scope of the sections. Unless the context otherwise requires, (a) each term stated in either the singular or the plural shall include the singular and the plural, (b) the words "herein," "hereof," or any variation thereof refer to this Agreement as a whole and not merely to any subdivision hereof, and (c) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any preceding general statement. The parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arise, no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

**8.9     Counterpart(s); Electronic Delivery.** This Agreement may be executed in one or more counterpart(s), each of which will be deemed an original and all of which will be deemed one and the same instrument. Delivery of an executed counterpart to this Agreement by electronic transmission will be as effective as delivery of a manually executed counterpart to this Agreement.

The duly authorized representatives of Channel Partner and Company have executed this CHANNEL PARTNER AGREEMENT as of the Effective Date.

**DIGITAL EARTH MEDIA, INC.**

By: _____

Name: Eric Ralls

Title: President

Date: June 27, 2022 _____

**HI INVESTMENTS, LLC**

By: _____

Name: Vernon Decossas

Title: Manager

Date: June 27, 2022 _____

2844092v.1

Exhibit 15
Page 6 of 6