# EXHIBIT 20

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TEXAS

IN RE: . Chapter 11
.
ERIC RALLS, . Case No. 24-60504
.
Debtor. .
. October 9, 2024
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF 341 MEETINGS OF CREDITORS
BEFORE TRUSTEE MARCUS SALITORE
UNITED STATES BANKRUPTCY TRUSTEE

APPEARANCES:

FOR THE DEBTOR: Kevin S. Wiley, Sr.
THE WILEY LAW GROUP, PLLC
325 North St. Paul Street
Suite 2250
Dallas, TX 75201

(Continued)

ORDERING PARTY: Amalia Y. Sax-Bolder, Esq.
BROWNSTEIN HYATT FARBER SCHRECK, LLP
675 15th Street, Suite 2900
Denver, CO 80202

DATE ORDERED: Friday, October 11, 2024

DATE DELIVERED: Thursday, October 24, 2024

TRANSCRIPT COST: 45 pages x $4.00 per page = $180.00

Audio Operator: Electronically Recorded

Transcription Company: A&S Transcript Providers
6 Trout Brook Road
Stanhope, NJ 07874
(973) 914-3080

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

For HI Investments, LLC: Amalia Y. Sax-Bolder, Esq.
BROWNSTEIN HYATT FARBER SCHRECK, LLP
675 15th Street, Suite 2900
Denver, CO 80202

For PlantSnap, Inc.: Dean E. Richardson, Esq.
FENNEMORE CRAIG, P.C.
3615 Delgany Street, Suite 1100
Denver, CO 80216

Matt Giblin, Esq.
PLANTSNAP, INC.
2014 East Arkansas Avenue
Denver, CO 80210

(Proceedings commence.)

TRUSTEE SALITORE: I hereby recall this first Meeting of Creditors in Eastern District of Texas, Tyler Division, Bankruptcy Case Number 24-60504, Eric Ralls, individual Chapter 11 Debtor. Here present is Mr. Ralls and debtor's counsel, Mr. Kevin Wiley. Mr. Ralls, would you please state your full name for the record?

MR. RALLS: Eric Ralls.

THE TRUSTEE: Mr. Wiley, can you confirm through voice recognition Mr. Ralls' identity?

MR. WILEY: Yes, I may.

TRUSTEE SALITORE: Thank you.

ERIC RALLS, DEBTOR, SWORN

TRUSTEE SALITORE: Thank you, sir. This is a continuance of the initial Meeting of Creditors. During that meeting, the U.S. Trustee asked questions and also other parties, primarily Mr. Giblin, not on the line today. We continued the Meeting of Creditors because there were other parties in interest who indicated they would have questions for Mr. Ralls, the debtor.

Before we proceed, Mr. Wiley, did you have any follow-up questions for Mr. Ralls?

MR. WILEY: No, I do not.

TRUSTEE SALITORE: Thank you. And I guess we can start with Mr. Richardson. Did you have questions for the

debtor?

MR. RICHARDSON: Yeah, I just had a couple follow-up questions, if the Trustee would indulge me.

TRUSTEE SALITORE: Please, just announce who you are, who you represent, and please proceed.

MR. RICHARDSON: Dean Richardson, representing PlantSnap.

DIRECT EXAMINATION

BY MR. RICHARDSON:

Q. Mr. Ralls, you testified last time, if I recall correctly, that the entities, and I don't think you defined that -- or defined that have taken in over a million dollars in calendar year 2024. I think you said 1.2 million. Do you remember that?

A. Yes. I remember saying that we've earned around $1.2 million this year so far.

Q. All right. And I further recall your testimony that the two bank accounts that you referenced had a total of about a thousand bucks between the two of them. Does that ring a bell?

A. Which two bank accounts?

Q. I don't know. You mentioned two bank accounts. You said one has 500, the other has 500, is what I recall you saying.

A. Probably. I don't -- I don't know. I don't recall the exact numbers.

Q. Do you recall what entities or what names are on those two

bank accounts with about a thousand bucks that's in them?
A. I think you were asking me about Digital Earth Media and Metaversal.
Q. And so the two accounts that you referenced in your previous testimony were Digital Earth Media, a non-bankrupt entity, and Metaversal Knowledge, a non-bankrupt entity. Is that correct?
A. Yeah, I think that's what we're talking about.
Q. Okay. Where -- what account or accounts did that $1.2 million flow into?
A. We're paid on thirty-day net terms and sixty-day net terms, which means at the end of the month, thirty days after the end of the month and sixty days after the end of the month, we -- we collect earnings from the revenue that we earned --
Q. I understand but I'm asking what --
A. That money has been deposited into --
Q. -- account --
A. Digital Earth Media, and then Digital Earth Media pays Metaversal. So the $1.2 million that you mentioned was deposited in Digital Earth Media's bank accounts?
A. No. What I keep telling you, Dean, and please understand this, you ask me how much revenue I've earned for the year --
Q. No, Mr. Ralls, I simply asked --
A. -- we don't collect cash -- we don't collect cash that is put into the bank account until thirty or sixty days after the

month in which we earned the revenue.

Q. I understand. I'm simply asking -- you testified that the companies have brought in about 1.2 million. I'm asking what --

A. (Indiscernible) -- we have earned -- please listen. Please listen. We have earned around $1.2 million in revenue this year. We do not collect the cash at the time that the revenue is earned. So $1.2 million of revenue has not been run through the bank account because we don't collect on a daily basis when we earn revenue. Does that make sense?

Q. When -- yeah, sure. When you do collect that revenue, what account or accounts will it be deposited into?

A. I assume -- well, I'm not sure. Kevin?

MR. WILEY: Go ahead and answer the question to the best of your knowledge.

A. To the best of my knowledge at this point would go through Digital Earth Media.

Q. Okay. And how much have you collected to date, actually cash collected?

A. I don't know.

Q. Could you ballpark it?

A. Somewhere -- somewhere around 750,000.

Q. Okay. And so you've collected 750. You've earned about 1.2, and these are rough numbers. I'm not going to hold you to exact numbers. And that money gets deposited into Digital

Earth Media's bank account whenever it's earned. Is that correct?

A. No. It's earned every day. It's collected when we receive it.

Q. Correct. Okay. Of the $750,000 that you have actually collected, what did you spend that money on since there's only about $1,000 in the bank?

A. Operating expenses and past old debt, mainly to the AWF.

Q. Okay. And of that $750,000 that was collected and put into Digital Earth Media's bank account, could you estimate how much of that money was transferred to Metaversal Knowledge?

A. Probably eighty percent of it.

Q. Okay. So eighty percent of the 750 was transferred to Metaversal Knowledge. Why was eighty percent of that money that Digital Earth Media collected to Metaversal Knowledge?

A. Because Metaversal Knowledge is a management company, and it manages all operations for Earth.com and EarthNet.

Q. Okay. And so you've collected about $750, you've earned about 1.2. So there's 450 -- 400,000 outstanding that will flow into Digital Earth Media's bank account?

A. That's probably the plan. I don't -- I'm not really sure what we're going to do moving forward.

Q. Okay. And you testified previously that EarthSnap is wholly owned by Digital Earth Media, correct?

A. That is correct.

Q. And so given your testimony about money coming into Digital Earth Media, roughly eighty percent of it going out to Metaversal Knowledge, why -- and the fact that EarthSnap is owned 100 percent by Digital Earth Media, why haven't you produced bank statements for those other two entities?

A. They will be produced along with the operating reports that have been previously filed in the case. We have just been waiting to get the updated bank account statements. Okay.

And so you, I think, last night or earlier today filed some reports that attached June, July, August, and September bank statements, but just from EarthSnap. Your testimony is you plan on producing the bank records for that same time period for both Digital Earth Media and Metaversal Knowledge. Is that correct? Correct, because the only thing you should see is the questions.

Okay. And that leads me to my second question, and see how one question leads to other questions, I apologize. But my next question is regarding Discovery.

My office served Discovery, and I don't believe Discovery was objected to, and EarthSnap. It was objected to last night at 11.38. It was objected to, and we're working to further supplement that objection. Well, I'd like to read that

objection, because Mr. Wiley, you said, Mr. Wiley, let me read it.

Yeah, go ahead. It was directed to Mr. Akers, and you said, I have reviewed your interrogatories, production requests, and requests for admissions. Detter generally objects to each of your Discovery requests as oppressive, burdensome, and not calculated to lead to the discovery of relevant evidence.

Detter also denies all the requests for admissions. You further say Detter reserved to supplement responses prior to any motion to compel. My question for Mr. Ralls is, Mr. Ralls, do you plan on answering the interrogatories that we served, and the requests for production, and the requests for admissions? I'll have to answer that question for him.

I'm asking Mr. Ralls, Mr. Wiley, please. I'm asking Mr. Ralls if he plans on responding to the questions that we posed, and does he respond on producing the documents we requested? I'll have to ask my counsel. Mr. Ralls, do you plan on answering questions and producing documents? You're going to follow the advice of my counsel.

I'm asking you if you plan on answering questions and producing documents. You were supposed to produce them and answer them

last night, and you didn't. And I'm asking you, do you plan on answering our interrogatories and our requests for production? I'll get to the question, because he didn't answer them.

And we've told you that we're going to supplement our answers. So, Mr. Wiley, I guess it's your testimony, and this isn't your examination, but it's your testimony that an email sent to us saying generally we object to everything is a proper response to the discovery that my office served. Yes.

Is that what you're saying? Yes. Okay, great. With that, I don't want to take up too much more time.

I'm going to pass to whoever is asking questions next. Thank you, Mr. Richardson. I guess we'll go to Mr. Thomas.

Thank you. And, Mr. Thomas, if you have questions for the panel, please proceed. Just start with announcing who you are, who you represent.

Okay. This is Peter Thomas, appearing on behalf of DEJ Partners, LLC. Ms. Ralls, first, I just want to clarify a point.

During the prior hearing, you had testified that Metaversal had

generated a billion dollars approximately year-to-date. If I understand correctly now, what you're actually saying is that Metaversal's income is not on top of or in addition to the income for DEM, but is actually just money that is flowing from DEM to Metaversal, correct? Correct. Metaversal manages all the operations for Earth.com and Earthnut.

Of the approximate $1.2 million that you have earned and the $750,000 of that that has been collected by DEM year-to-date, how much of that is recurring revenue versus one-time revenue? Recurring revenue? Earth.com doesn't - it's not an app, so it doesn't have recurring revenue. How much of the $1.2 million has come from investors? You asked me about revenue, so none of it has come from investors. Okay.

Have you or any of your companies brought in any money from investors this year? No. Have you or any of your companies borrowed any money from investors or banks or lenders of any type this year? Yes, on a factoring relationship. How much? I don't know.

I think it's close to - Ballpark for us, please. $75,000. And you described this as a factoring relationship, meaning you were borrowing money to pay debts.

Borrowing money and pledging accounts receivable. Correct. Right.

And then you're pledging the accounts receivable to someone else. Correct. And who is that someone else you have pledged approximately $75,000 of accounts receivable to for your factoring? He's one of the investors in Digital Earth Media named Bill Jarres.

And has this been listed as a liability anywhere on your schedules? No, because it's not - it shouldn't be on my schedule. This is - Digital Earth Media is not in bankruptcy. Okay.

So this is a DEM, Digital Earth Media. Is it okay just for purposes of my discussion today if I reference DEM? You'll understand that to mean Digital Earth Media, right? I will. Okay.

So what you're talking about is a factoring arrangement between Mr. Jarves or Jarres and Digital Earth Media for the $75,000 of revenue. That's correct. So it has no place in this discussion.

Let me quickly follow up also on some discussion that - or some testimony that I wanted some clarity from during the prior

hearing. When we left off, you had been talking about your housing expenses. You're living at 6961 Park Slope in Tyler, Texas.

Is that right? That's correct. And that's a house that you testified is being rented by Metaversal? No, that's incorrect. Okay.

Maybe I misunderstood. Who's renting that house? Renting what house? Well, 6961 Park Slope is a single family. That's owned by my mom.

Right. That's actually where I was going. You're living with your mom, aren't you? Most of the time, yeah.

Okay. So you were testifying during the last hearing that there was a lease by Metaversal, and that Metaversal Knowledge was paying all those expenses. That's not correct, is it? It is correct.

Okay. Well, then go back to the question I just asked you that you said I didn't understand. Okay.

So are you saying Metaversal Knowledge has a lease with your mom? No. I'm saying Metaversal Knowledge is not a party to this

discussion, and it does have a lease. Well, Metaversal is very much a party to this discussion, Mr. Ralls, because isn't it true that you were using Metaversal to pay for your living expenses? Metaversal pays me to manage the company.

Is that what you mean? Well, you don't have a bank account, right? Not yet. I'm in the process of getting a VIP account. So you have been using Metaversal Knowledge to pay all of your personal bills and expenses, correct? Well, as I mentioned last time, it's a pass-through-ass corporation.

Okay. So I'm correct, right? It's a pass-through-ass corporation. That's not my question, Mr. Ralls.

The money that you're listing as all of your housing expenses is not coming from you. It's coming from Metaversal, true? It's true in a certain way, but it's ultimately coming from me because it's taxable income for me personally. Okay.

Let's turn to your amended summary of assets and liabilities that you filed on September 25, 2024, please. Do we have that in front of you? Yes. And looking at the first page of Form 106, the summary, and I'd like to start with your liabilities.

On page 1, part 2, you summarize your total liabilities as

being $476,834.26, correct? Yes, that's what it says. And then for details of those total liabilities, we can then turn to Form 106-D, Schedules D and E-F, right? What page? Well, if you dropped, say, maybe 10 pages into your document there, you see Schedule D. Yes. Creditors who have claims secured by property.

Yes. All right. Let's pan down.

So here you list $84,338 in change that is owed to Plantsnap, correct? No, it looks like Patrick Akers. Well, you actually owe the money for attorney fees to Plantsnap, don't you? Not trying to get technical, but that's actually who's owed the money, right? I don't know. I thought it was the attorney.

Okay. Well, regardless, you've listed secured debts that are owed to what we just called Mr. Akers on behalf of Plantsnap, and then also myself on behalf of DEJ Partners, both as attorney-awarded fees, correct? That's what it says, yes. And just to be clear, these are the attorney fees that the district court in Colorado ordered you to pay to my client and to Plantsnap, right? I believe so, yes.

And they're in relation to when you were held in contempt of court, you were incarcerated and thrown in jail by the judge in a civil lawsuit for the intentional destruction of evidence,

right? Kevin, isn't that exactly right? No, I'm going to reject that question because it certainly is not something that's relevant to this proceeding. We have a 341-3812 in the district, not for Colorado. It goes very much to his credibility, so I'd like to continue and have him answer the question on the record, please.

But I'm going to instruct him not to answer the question, because that's a legal conclusion. You're saying that whether or not he went to jail for contempt of court, and that's why he was awarded these legal fees, is a legal conclusion? Yes. Okay, fair enough.

Let me just follow up with this thing, Mr. Ross. Can you tell me, please, why, when we look through Schedule D and Schedule E-F, you are not listing and disclosing to the bankruptcy court the February 29, 2024 judgment against you in favor of Plantsnap for $705,000? That doesn't show up on your schedule, does it? I don't see it, Kevin. Do you know? No, because we're contesting that because there was a substantial agreement that was ever signed and executed to support that judgment.

And as a result, we're contesting and filing a lawsuit with Tyler and the district court to dispute that that judgment was effective. Because how could you have a pre-judgment? Mr.

Wiley, if I could interject, Mr. Wiley. Mr. Wiley.

There was a judgment on a settlement agreement that was never executed. Okay, Mr. Wiley, this is not the... Mr. Wiley, if you would please refrain from making your legal arguments in this forum. This is not the appropriate forum for you to argue legally, okay? Yes, sir.

If there's a judgment that hasn't been included in the schedules, Mr. Ralls, can you say why if you know? If he knows. I don't know. I'm following the advice of counsel.

Okay. Is there a judgment... Do you acknowledge that there's a judgment that was not included in the schedules to Plantsnap? I think that's what Kevin was trying to explain to you just a minute ago. I wasn't asking what Kevin was trying to explain to you.

Can you acknowledge that there's a judgment to Snaps that was not included in your schedules? I suppose I could. Okay. Then I guess that means yes.

Okay. Mr. Thomas, did you have further questions? I'm sorry. I do.

Thank you. Mr. Ralls, in the same vein, you also did not include in your schedules the March 4, 2024 judgment against you in favor of my client DEJ Partners for $978,043.23, did you? I will stipulate to that. Mr. Ralls, this is your testimony.

Will you please admit that you did not include the March 4, 2024 judgment against you in favor of DEJ Partners for $978,043.23? Yes. It does seem like Kevin said that we will stipulate to that for the reason he discussed earlier. Will you also then stipulate that you also did not include in your schedule the $1,500,000 judgment entered against you in favor of my client DEJ Partners on July 31, 2024? I'll stipulate it.

Mr. Wiley, would you please allow the debtor to answer the questions? Yes. We will stipulate to that based on what Kevin was discussing earlier. And so then will you also stipulate that you did not include on your schedules the $2,500,000 judgment entered against you in favor of PlantSnap on July 31, 2024? Yes.

We will stipulate to that based on Kevin's earlier statement. So, a quick math here, Mr. Ralls. By stipulation, you are acknowledging that you have left off of your schedule of liabilities $5,683,043 of judgments that you just somehow

overlooked.

Is that right? No, they weren't overlooked. They're being contested. Contested, but you didn't think it was important when you're filing a schedule under oath in a federal bankruptcy court to include this information? I'm following the advice of Johnson.

You see where there's a box that says you can list it as disputed, but you didn't do that, did you? You just concealed it from everybody. I'm following the advice of Johnson. I approve.

I'm following the advice of Johnson. I'm sorry, Mr. Thomas. Just to clarify, Mr. Ralls, your testimony for the reason why you did not include four judgments in your schedules is that Mr. Wiley advised you not to include them.

Is that correct? That is correct. They helped me to repair these bonds. Thank you.

Mr. Thomas, please proceed. Mr. Ralls, why don't we turn now to your assets. Go back to the first page of your 106 asset schedule here.

Yes. On the first page, part one, you summarize your assets as being worth $11,501,979. Correct? Correct.

For details of all these assets that you own, we would turn to Schedules A and B. Why don't you turn there with me? What page? It's about three pages in. You see where it says Schedule A, B, Property? Yes. Okay.

And down to paragraph 19, a couple pages down from there, you see where you list Digital Earth Media? I do. And so of this $11,501,979 of assets, $11,500,000 of your total assets are comprised of stock that you claim to own in Digital Earth Media. Right? That is correct.

Mr. Ralls, this isn't even your stock anymore, is it? No. Because I asked for a legal conclusion that the filing of the bankruptcy did not constitute an autonomous stay or closure against the stock, against Eric Ralls, individually. Mr. Wiley, I appreciate your legal argument, so I'm happy to entertain some debate with you.

It's not a legal argument. It's an objection to questions that ask for a legal conclusion. I think these are factual questions that your client ought to be able to answer with reasonable yes-or-no questions.

Why did you say no? Because the problem is... Mr. Wiley, if I need to put you on this oath, and I need to put you on this oath, Mr. Wiley, I will. The creditor meeting is for the purpose of Mr. Ralls. Okay? I would ask you to please refrain from your legal argument.

Mr. Ralls, do you own the stock in Digital Earth Media? Mr. Ralls, do you own the stock in Digital Earth Media as represented on your schedules? Yes. Thank you. Mr. Thomas, could you please proceed? Yes.

Mr. Ralls, let's explore that then if we need to. On February 19th of 2024, you entered a settlement agreement with DEJ partners in PlanSnap to settle the litigation in Colorado, correct? I believe we signed a letter of intent. It's not a letter of intent.

We never signed a letter of intent. We never signed a letter of intent. Mr. Ralls, you signed a binding term sheet, didn't you? Two binding term sheets, in fact, right? Yes, I signed a term sheet.

I did not sign a settlement agreement. And it is called a binding term sheet, correct? I don't have it in front of me. Mr. Ralls, you do recall the shares of stock in Digital Earth

Media.

So you owned 8,178,571 shares in Digital Earth Media, correct? That's the 86% ownership? That's correct. You pledged all of those shares, 100% of your stock in DEM, was pledged as collateral to secure your obligations to DEJ partners and PlanSnap pursuant to the binding term sheets. Isn't that right? I believe it was pursuant to the settlement agreement that we never signed.

Well, Mr. Ralls, I'm representing to you that the binding term sheet actually says that you're pledging all those shares. You're not disputing that, are you? I am disputing that. I'm disputing that we never signed the binding settlement agreement.

We worked on it for a few months, but it was never signed. The binding term sheet that you signed required you to deliver all of these stock certificates for all of the stock you owned in Digital Earth Media to escrow agent, correct? I don't recall a different representation. The binding term sheet, Mr. Ralls, also required you to deliver a stock power certificate to DEJ partners and to PlanSnap, correct? From what I recall, that was all based upon a settlement agreement that was never signed.

Mr. Ralls, DEJP called a non-monetary default based on your refusal to deliver the stock certificates in Digital Earth Media, right? I'm not aware of that. You don't recall receiving a notice of default by DEJ partners that you're in default under the binding term sheet? I never personally was served anything from DEJ partners. I had representations for that matter.

Mr. Ralls, I emailed you directly and you responded to it. So did your attorney. Now, are you testifying you don't recall that? I'm testifying I don't recall that.

Okay. Do you recall that you stopped making payments to DEJ partners and to PlanSnap under the binding term sheet? I recall that, yes, I did miss a payment. So you started making payments under the binding term sheet, right? Yes.

And you treated the binding term sheet as an obligation that you were trying to honor, right? No, we agreed under as a good faith gesture to continue to do that as we were negotiating the settlement agreement. You didn't stop making payments under the binding term sheet, did you? Yes. Okay.

And so you defaulted under the binding term sheet. That's not in dispute, is it? Yes, it's not stipulated. Okay.

That's stipulated. And Mr. Ralls, the binding term sheet that you entered with DEJ partners and with PlanSnap states that DEJP or PlanSnap in its binding term sheet, upon an event of default that is stipulated by your counsel, shall be empowered to exercise all voting and other rights associated with the pledged shares until the time of their disposition of the obligation by the automatic stay. The automatic stay prevents you from concluding the binding term sheet as an executive contract.

And you know bankruptcy laws as well as I do. The automatic stay stops you from concluding the binding term sheet. And that's our position.

And my client's going to be instructed not to answer any further questions about whether or not he's obligated under the binding term sheet under 11 SB-365 or 361, 362, or 363. Mr. Wiley, Mr. Wiley, again, I will ask you to refrain from the legal argument. Mr. Thomas, if you could keep your questions to fact questions and not legal conclusions that Mr. Ralls may be unable to make.

Thank you. Mr. Ralls, you're aware that the binding term sheet states that, upon an event of default, that my client is empowered to exercise all voting and other rights associated

with the pledged shares until the time of their disposition. Is that not a request for a legal conclusion? Mr. Thomas, Mr. Wiley, the document says what the document says.

And Mr. Thomas, if you have a question for Mr. Ralls, please proceed. That's what I'm trying to ask and I keep getting rudely interrupted here. It is a fact question I'm asking him to acknowledge simply that the binding term sheet provides that upon an event of default, which his attorney has now stipulated to on the record, that my client is empowered to exercise all the voting of these $11,500,000 worth of shares that he is claiming on his asset sheet to be assets available to pay off creditors.

That's the problem. Mr. Ralls, are you aware if the document says that? Yes or no? I'm aware the document refers to a settlement agreement and default to the settlement agreement would result in me losing the shares. We never signed a settlement agreement.

Okay, I understand that issue is under dispute. Mr. Thomas, could you please move on? Yeah. Mr. Ralls, the district court in Colorado entered a confession of judgment that you signed, correct? What? You remember signing a confession of judgment that's been entered against you? You mean it was part of the

term sheet? It was entered as part of the term sheet when you defaulted, that's correct.

Do you recall that? Yes. And this confession of judgment that was entered by the district court references that you had been sued and admitted to fraud, fraudulent inducement, fraudulent transfer, securities fraud, conversion, and civil theft, right? I don't recall off the top of my head. Do you happen to recall signing the confession of judgment and admitting that you had acted with willful and wanton and malicious conduct towards TEJ partners in Plant Snap? I recall signing the confession of judgment that would be enforced upon if the settlement agreement was not followed through with, and we never signed a settlement agreement.

And do you recall, last question, in that confession of judgment, Mr. Ralls, that you admitted that your conduct meets the standards set forth in 11 U.S.C. section 523A regarding the non-dischargeability of the obligations that you owe to TEJ Plant Snap? Objection, asking for a legal conclusion. I'm just asking if you remember signing that in the confession, Mr. Wiley. Please listen to my question, Mr. Wiley.

Yes, sir. Do you recall signing that, Mr. Ralls? I recall signing a term sheet and a confession of judgment based upon a

signed settlement agreement, which we don't have because we never reached an agreement. Very good.

No further questions. Thank you, Mr. Thomas. Ms. Sachsholder or Mr. French, did you have questions for the debtor? Yes, sir.

This is Ryan French, appearing on behalf of High Investments. Thank you, sir. Please proceed.

I'm sorry? I said, I'm sorry. I said, thank you, sir. Please proceed.

Yes, Mr. Ralls, in looking at your schedules and listening to your testimony, it sounds like you claim to own, to varying degrees and through various paths, four different legal entities. I just want to confirm that. You claim to own Metaversal Knowledge, correct? Correct.

And you claim to own 100% of that entity? Yes. And I see on the schedule that you claim to own Earthsnap, but you don't claim to own Earthsnap directly, correct? That's correct. You own a majority stake in DEM, which in turn owns Earthsnap.

Is that correct? Yes, sir. And what is the stake that you have in DEM? Roughly 86%, I believe. Okay.

And it's your testimony that DEM only owns two entities itself, which is Earthsnap and Earth.com? That's correct. Is there a reason you listed Earthsnap as being an entity that you own on your bankruptcy schedule and not Earth.com? Earthsnap is in bankruptcy. That's probably why.

Okay, but you don't claim to own Earthsnap through any kind of different holding structure or company structure that you do Earth.com? No, no. Does DEM own any other business or investment interest or equity interest other than Earthsnap and Earth.com? No. It's hard to tell from looking at your schedules.

Do you claim to still own a stake in Plantsnap, or do you concede that you no longer own any part of Plantsnap? I think that comes to a legal conclusion. I can't remember if my stock in Plantsnap was part of a settlement agreement that was not signed or not. Okay, so depending on that dispute you've alluded to today, you may or may not still own a stake in Plantsnap.

Is that correct? From what I recall, yes, that's correct. All right. So other than Metaversal Knowledge, what we've just talked about, and DEM, which we've just talked about, and Plantsnap, which we've just talked about, are there any other

businesses or entities of any type that you have a direct or indirect ownership stake in? Yes.

After the bankruptcy filing, I started a new LLP. And what is that called? It's called GreenMind. Is that one word or two? That's one word.

And where is that LLP formed, or under what state's partnership laws? And how much of a stake in GreenMind LLP do you own? 100%. There's no minority investors or other women's liability partners in that entity other than you personally? That's correct. And you own that 100% interest in that LLP individually and personally, correct? Correct.

Did you capitalize GreenMind with any type of investment or capital contribution? I believe it was $100. Does GreenMind have a bank account? It does now, yes. And that bank account is in the name of GreenMind? And that's where that $100 is to open that initial bank account? That's correct.

That $100 came directly from you? No, that $100 came from Metaversal. So Metaversal Knowledge, through that bank account that you talked about today, that Metaversal Knowledge has, provided the $100 capital contribution that was used to open GreenMind and deposit it into GreenMind's bank account? That's

correct. What does GreenMind do? Right now, not a whole lot, but it's going to do much more in the future.

Does it have any assets other than the $100 in that bank account? It will in the future, yes. What assets do you anticipate it acquiring or creating? That's confidential information at this time. Does it have anything to do with the development of any type of camera, via camera recognition app or anything like that? No.

No. Does it have anything to do with the website or content on Earth.com? No, it does not provide Earth.com content. Does GreenMind have any... I'm sorry, let me ask that again.

Does GreenMind, is it in any way related to the content or what's on the website of Earth.com? Yeah, in some ways. How would a creditor of, say, Earth.com or an owner of DEM know where the line is between GreenMind and the DEM umbrella of companies? GreenMind's just a contractor. What is it a contractor? What type of services does it provide as a contractor? That's what's still under confidentiality right now.

Is GreenMind being formed to sell any goods or just services? SAS, software services. Explain that to someone who's as dumb

as I am about what that means. SAS stands for software as a service.

It's just software development that companies use. And it is, in essence, a software that you would build the software and connect it to clients who pay a subscription fee or a licensing fee to use it? That's pretty close, yes. Is GreenMind, is it focused on identification or explanation or information relating to living plants or animals? No.

Other than the entities we've just talked about, which I'll recite again as metaversal knowledge, DEM, possibly PlantSnap, and now GreenMind, are there any other entities or businesses of any type, whether incorporated or not, that you'd own any interest in? No. Did you say eLeft.Earth, Snap, and Earth.com? And only Earth.com. Correct. Right.

Yes, that's correct. You mentioned earlier that there's another DEM investor named Bill Jarrus who you've had dealings with. Is that correct? Yes.

He's on the balance sheet for several years as a convertible note holder. And what is his equity stake in DEM? He doesn't have equity. He's a convertible note holder.

If his convertible note were to be converted to equity, do you know what stake that would equate to in the company? Less than 5%. And how would the existing owners of DEM be diluted, including yourself, if his shares were to be converted? Would that dilution apply only to you or to all investors? I'm not sure how the operating agreement for DEM spells that out. Is Mr. Jarrus, to your recollection, a party to that operating agreement? No.

The only parties to the operating agreement are me and H.I. Investments. Does DEM have a contract with Mr. Jarrus? Yes. It's a convertible note.

It's from back in 2022. And other than the actual convertible note itself, is there another document that DEM and Mr. Jarrus have signed that relates to his rights as a shareholder or any subscription rights or anything like that that he has? No. I think it's just the convertible note.

He's not a shareholder. You have mentioned that Metaversal is a management company. Is that what you said? Yes.

And what do you mean by that? What type of services does it provide? There's a lot of overlap in the work done on Earthsnap and Earth.com. They share a lot of resources and content. And

one person may work on something that is used in both companies. So rather than having each company, Earth.com and Earthsnap, hire different people to do the same job, it made more sense to have a third-party management company hire the same people that could do the work that benefited both companies.

Without having to somehow parse it out as to what percentage of this content should be attributed to an Earth.com expense versus an Earthsnap expense. So if that is the case, then how do you determine whether Earth.com or Earthsnap pays Metaversal knowledge or how much each pays for any given expense? Well, Earthsnap just this week has relaunched, so it hasn't been earning revenue and hasn't needed to pay any expenses. But nevertheless, before this week, Metaversal Knowledge has been providing management services and programming resources to Earthsnap? Not recently, no.

But in the past, yes. So let's say the last six months or two a year, the services being provided by Metaversal have related exclusively to Earth.com. Is that your testimony until very recently? Not exclusively. It's more like 90% Earth.com, 10% Earthsnap.

Okay. And given that 90-10 breakdown, was Earth.com paying for

or accruing a payable or a debt or anything like that for the 10% that corresponded to Earthsnap? No. So even though, and I think I understand, just to be clear, basically because most of the work being done by Metaversal, at least recently, related to Earth.com, it was just paying 100% of the bill, although some of that work was also for Earthsnap.

Is that right? That's correct. I mean, it's content that's used by both entities. Is there a contract? Which entity owns that content? Well, the content, so there's content that's used in both.

They're very entwined together, and they have been since day one. There's about 2 million pages of content for species of plants and animals. That content is on the website, Earth.com, and it's also used to provide information about species that are identified by the Earthsnap app.

And that's why we had a holding company to own both entities, because there was so much overlap between the two. Mr. Ralls, I interrupted you as you were about to give an example a moment ago. Was that the example, or did you have another sort of specific example of where the content might overlap? That was the example.

Understood. So, in that example, is the content actually owned by Earth.com, because that's where the database is, and Earthsnap will sort of borrow from it? I would say it's owned by Digital Earth Media. And why do you say that? I'm just curious.

Because both Earth.com and Earthsnap use it, and Digital Earth Media owns Earthsnap and Earth.com. Does Digital Earth Media directly pay any of the bills or for the services provided by Metaversal Knowledge? Yes. It's an Earth Media bank account. Oh, because, that's right.

So, Earth.com and Earthsnap don't actually have separate bank accounts. Could they both sort of use their money and pool it in the DEM bank account? Yeah, Earthsnap has a separate bank account. Earthsnap does have a bank account.

Just one? Yes, just one. How long has that bank account been open? 2022. Okay, I'm sorry.

I thought I misunderstood your past testimony as being that Earthsnap and Earth.com had Wall Street bank accounts, but Earthsnap has retained a bank account for the last couple of years. Yeah, they both did lose them from the bank I was using, and then I opened up a new one for Earthsnap at a new bank. And

that was in 2022 about? Yeah, I think it was the beginning of 2022.

I don't know the exact date. The revenue that you indicated is starting to be collected by Earthsnap. Is that being paid into the Earthsnap bank account or to the DEM bank account? Earthsnap bank account.

And then, is Earthsnap then making payments to Metaversal Knowledge? They will, yes. Now that Earthsnap is active again, they'll have different needs besides just content sharing, such as customer service and AI coding programmers who would be specific to the Earthsnap app. Does Earthsnap app, like AI coding people, would be paid directly by Earthsnap? Are there any outstanding loans between Earthsnap and DEM and Earth.com? No.

Any combination of those, I'm asking. Is any one of those a borrower with respect to the other? No. Does DEM have a contract with Earthsnap or Earth.com? There's a lot of contracts.

Other than shareholder agreements or investor contracts as owners of the entity, are there any service agreements or expense sharing agreements or management agreements or any

other contracts of any type between Earth.com, Earthsnap and DEM? I think in the corporate agreements when they were set up, there were some things that were specified, but I can't recall. But there's not anything separate between the two other than whatever the lawyers create when they create the entities and the shareholder agreements. Other than those created at inception agreements, what I would call ownership agreements or operating agreements, you're not aware of any other contracts between or among DEM, Earthsnap and Earth.com? No.

They've always just operated as brother-sister entities. And despite the entwined nature between Earthsnap and Earth.com, there is no contract or separate agreement between those two separate entities. Is that right? Well, I think there might be some stipulations in the initial setup agreements that the two share data and information.

It's been that way since inception. That's why we set it up as DEM, the holding company, because there is so much intertwined between the two companies. I'm going to switch now and ask about Metaversal Knowledge.

Does Metaversal Knowledge have a contract with DEM? No. Is that neither written nor verbal contract, as in neither a written or unwritten contract between Metaversal and DEM? Well, the verbal

contract would be with me, because I would be the one who had done it. Any verbal contract with DEM, since I'm operating it, would be done with myself.

Understood. Is there such a verbal contract between DEM and Metaversal Knowledge? Yes, Metaversal Knowledge handles the management of both Earth.com and Earthsnap. So, is there a written or unwritten contract between Metaversal Knowledge and Earth.com or Earthsnap, or is that contract only with DEM? Well, the contract is with all three entities.

It's nothing written. There's no written contract. Understood.

So, you would consider that contract for Metaversal's management services to be with DEM, Earthsnap, and Earth.com. Is that right? Yes, because Metaversal works with all three under the same capacity. And what are the terms of that contract, as much as you know them right now? Metaversal hires contractors to do the work that's required to operate Earth.com and Earthsnap. Are there any other terms to that agreement other than Metaversal's agreement to hire and provide services to those three entities? I mean, yeah, it just manages and does everything that runs both the entities and makes sure that content, coding, writers, editors, sales agreements, all of it.

What compensation is Metaversal entitled to as a result under this agreement? Metaversal is not looking to make a profit. That's not the goal. The goal is to make it easier to manage two separate entities that share content and services.

Understood. So, there's no agreement between Metaversal Knowledge and DEM, Earthsnap, or Earth.com in which Metaversal is compensated for anything other than its expenses in this service provision arrangement? That's correct. Metaversal's not trying to go and make a profit or be sold to anyone.

The only objective of Metaversal is to build Earth.com and Earthsnap into the best companies that they can become. Are you paid by Metaversal via wages as an employee or just as an owner or both, if you will? There's no employees with Metaversal. So, you provide, including with yourself, you provide contract labor to Metaversal? I do.

It's my only job. And what is your compensation in exchange for that job? I think it's listed. I know it's listed on my bankruptcy filing.

I have on one of your bankruptcy filings, it looks like you claim compensation of $7,000 a month. Is that correct? That would be on average. Sometimes I'm not able to earn that much

in a month, in the previous month at least.

So, where you've listed $7,000, and I'm talking about docket 14, page 18 of the PDF, your bankruptcy schedules, where you've mentioned $7,000 there as sort of a monthly average, that would be, that $7,000 is money that you're indicating would be coming exclusively from Metaversal Knowledge. Is that correct? That is correct. How does Metaversal Knowledge pay you? Does it issue a paycheck or write checks to you? No, right now it's a pass-through-S corporation.

I understand that for tax purposes it's a pass-through-S corporation. What does that mean with respect to issuing you payment or writing checks to you? I don't have a bank account personally. I see.

So, as a pass-through-tax entity, you sort of use the money from its account rather than actually going through the exercise of writing checks to yourself or withdrawing cash to yourself and putting it elsewhere. Is that right? That is correct. It started that way back when my account was closed along with the other accounts because of all the subpoenas through the bank records from the lawsuit.

How do you determine in any given month how much to pay

yourself? If there's enough money to pay myself $7,000, I do. If there's not, I don't. And when you say pay yourself that $7,000, what are you doing to pay yourself $7,000? Or does that just mean you're able to spend $7,000 from the Metaversal Knowledge account that month? That's what it means, yes, sir.

And when you do that, are you depositing cash anywhere else or saving cash anywhere else, even physically under your mattress or anything? Or that $7,000 is essentially spent entirely? No, I don't have any savings. I've been going through lawsuits and bankruptcy proceedings for a couple of years. Understood.

So where your bankruptcy schedule indicates that your compensation is about $7,000 a month, what that really means is not so much that you're removing $7,000 and putting it somewhere personally for you on average each month. It just means that it covers about $7,000 of your ongoing expenses personally each month? That's correct, yes. How is that $7,000 in expenses spent each month? Or take it annually, that might make more sense.

That's $84,000 a year. What are those expenses for, generally? It's a lot. We have to fill out a very detailed form in the bankruptcy form.

It outlines very specifically. What is the amount of rent that is paid each month for that residence you indicate you live at? Because all four entities share it, I'm not exactly sure. That's an accounting question.

All the four entities use it as an office and I use it as a living residence. So I don't know the exact answer to that. Who is the owner of that house? That is your mother? Yes.

Does she receive payment from you or any of these entities for use of the property? No. Okay. So the truth is no one is paying any rent.

You're able to live and work from there for free as well as these entities getting the benefit of that for free? No. Metaversal Knowledge, the lease that it has is on a different house. And what house is that? It's a completely separate entity.

I think we've provided the lease. I was requested to provide the lease in our better call and we gave them a copy. So that's a lease that relates to a house that you're not living at, correct? I live in a part time.

I have cancer and I go back and forth between a couple of

places for doctor purposes. That's about all I'm going to say about that. Understood.

I'm sorry about that. So you live part time at your mother's house and you live part time in a house that's rented by Metaversal Knowledge. Is that correct? That is correct.

Okay. I'm sorry. I misunderstood that before and thought that to be the same house.

The house that's rented by Metaversal Knowledge, how much rent does it pay a month? $6,000. And where is that house located? For medical reasons I'm not going to get into that. Is it in Texas? Can I ask that? I'd rather not discuss my health issues other than to tell you that I have cancer.

How is the $6,000 a month that's paid by, is that a check that's written by Metaversal Knowledge each month? That's correct. And do you know who the owner of that house is? I do. I provided the links.

I don't have a copy of it. Would you mind telling me who the owner is? The owner is, I don't remember if the owner is a company or if it's a person. I go through a management company.

Do you have any family or financial connections to the owner of this property other than being a tenant at this house? No. Do you know how many square feet this house is? Right around 2,800. And this is, is there a dedicated office portion of this house? There's two separate offices, yes.

And there's a dedicated portion of the house that's $6,000 a month to rent? Correct. I don't really understand that question. I'm asking about the house that costs $6,000 a month to rent.

I'm asking if some portion of this house that's being paid for by the business is dedicated for, specifically for office space or business purposes. Yes. Is that one room, a particular room or something? There's, it's the majority, all I do is work all day and sleep, so that's what it's for.

I don't go to an office. I work and sleep in the same place. And the house where I work and sleep has two separate rooms that I use as offices.

And that's where you're doing most of the work when you're there working? That's where I do all of it. The $6,000 a month that's to pay for that lease, that's separate from the $7,000 a month of expenses that are paid on your behalf on average by

Metaversal Knowledge, is that correct? It includes part of it. That's an accounting question.

I don't know the exact amount that's going to be charged to me on my tax return for rent versus what will be charged to the entities for rent. Understood. So some portion of that monthly rent is actually going to be treated as a personal expense and not as a business expense is what you're saying? Yes.

Do you have a contract or written agreement with Metaversal Knowledge? I do not, other than just owning it. And would you say that you have an unwritten or verbal agreement in terms of being a manager or operator of Metaversal Knowledge? I would say that, yes. And what are the terms of that agreement? The terms are that I run the company and by running the company I also run EarthSnap and Earth.com and Digital Earth Media and provide the services that they need to succeed.

And in exchange for that you're entitled to essentially on average about $84,000 a year of having your expenses paid for? If that amount is available, yes. What if more than that amount is available? Are you entitled to more in that case or would it still be about $84,000 a year? No, the goal is to sell Digital Earth Media for as much as possible for both myself and the shareholders and the investors, not to earn a big salary.

That's not what I'm doing.

Understood. So if there's to be essentially an income generated from DEM, then that should generally stay within DEM and be distributed to its owners after taking into account essentially an $84,000 or so salary to you through Metaversal Knowledge? That's correct. You said that Metaversal, other than the house you referenced and also the use of your mother's house, Metaversal, Earth.com, EarthSnap, DEM and GreenMinds, none of those have separate offices that they use or rent anywhere else? No, they don't.

Have you used a third party accountant to provide accounting services or tax preparation services to Metaversal Knowledge? I did in the past. I was unable to afford it this year. So does that mean, are you looking for another third party accountant or CPA or are you planning to handle the taxes yourself? No, I'll be able to hire someone again before the end of the year.

The company's doing quite well right now. Is anyone currently providing bookkeeping services or tax preparation services to Metaversal, DEM, EarthSnap or Earth.com as of this moment? Only QuickBooks. And who administers or oversees the use of QuickBooks and the entry of data into it for those entities? I oversee the QuickBooks accounts, but the transactions are

imported automatically from the bank statements.

They're connected directly to the bank accounts. And as far as there is a human overseer or administrator of this QuickBooks process, that would only be you? At this time, yeah, until I hire an accountant, yeah. And that would be true for DEM, Metaversal Knowledge, Earth.com and EarthSnap, is that right? That's right, it's a one-man game.

Mr. Raul, do you own any cryptocurrency, either directly or through any entity? I do not. You don't have any Bitcoin or a Coinbase account or anything like that? I have a Coinbase account. I do not own currency.

Some people overseas prefer to be paid in crypto. Do you know how much the U.S. currency value of that account is? Right now, it's $0. That's what it always is.

I don't ever keep money in it. Do you use that simply to convert cash to cryptocurrency to pay when that's requested by a vendor or service provider or something? That's correct. Is that Coinbase account in your name or the name of an entity? It's in my name.

The vehicle that you referenced before, I think, was a Yukon or

a Tahoe, is that correct? Yes. Do you know whose name or what entity's name is on the title of that vehicle? Yeah, Digital Earth Media. Come back, there's actually one.

That's whose name is on the title, is that right? Yes, I did provide that as well. And you said there still is an outstanding finance debt owed for the purchase of that vehicle? Yes, this is 2011. Do you know in whose name or names... I'm sorry, I interrupted you.

I'm sorry, go ahead. I know as well. I was going to say it's a 2011 Denali that has a loan from GM Financial.

Actually, it's called Ally Bank now. Do you know in whose name or names that auto loan is in? Is that in your name personally or an entity's name? Oh, it's in the entity's name because that's what's on the title. I don't have the title because it's done by Ally.

Mr. Ralls, you referenced that, I think you said it's EarthSnap that you said is now doing quite well, is that correct? No, Earth.com. EarthSnap just relaunched this week. It will be doing well again by the spring, but we just built it and relaunched it. When you say relaunched, what does that mean for someone not familiar with the business? It was just sort of

sitting dormant for a while during this lawsuit and the previous bankruptcy.

We updated the front end and the back end and formed a partnership with a company called Matic for marketing services. They provide all the cash up front for the marketing and we split the revenue with them 50-50. So, EarthSnap has some type of marketing contract that involves 50-50 split of revenue with this company called Matic? That's correct.

When was that contract executed between Matic and EarthSnap? That's part of our EarthSnap filing. You can read the whole contract yourself. Would you mind telling me what you remember because I don't remember saying that in there.

What was the question? The date of the Matic-EarthSnap contract? It looks like it was in May 2024. I don't know the exact date. That was executed just prior to filing the bankruptcy on behalf of EarthSnap.

Is that right? I think the bankruptcy was mid-June and the agreement was entered into the first part of May. Is that the agreement that's referenced in either you or PlantSnap's filing as a recent marketing arrangement that you are anticipating results and significant profits for EarthSnap? Yes. Have you

been tracking downloads or some other metric of app popularity or app profitability since that contract was inked or since the relaunch? It was relaunched yesterday.

Just relaunched yesterday. And by that, that means that the app which was previously unavailable for say download in the App Store is now freely available and being monetized. Is that right? It means that the marketing for the app began yesterday.

We published the new app into the App Store. It was accepted by Apple for listing and it's now listed in the App Store. And so they have started to slowly roll out the marketing campaign.

And you said that you're expecting it to become profitable in the spring, I believe? Yes. The last few months of this year. It's a seasonal app until we translate it and take it international.

So in the next few months, we'll be doing the test run and optimizing all the marketing campaigns and the keywords and the App Store optimization to be prepared to hit it big when the leads come back and the bugs come back. The animals return and spring returns in the Northern Hemisphere. And then next year, we'll translate it into probably 10 different languages and be able to make a push in the Southern Hemisphere when it becomes

winter in the Northern Hemisphere next year.

And this is a plan and essentially a business expansion more or less being overseen by Matic in terms of the marketing and expansion of it? All that Matic does is the marketing. Okay. So the expanded rollout and going international is something that you would have received through Metaversal Knowledge? That's correct.

Mr. French. Okay. Thank you, Mr. Ralls.

That's all the questions I have. I appreciate that. Thank you.

Thank you, Mr. French. Actually, I was just going to interject. Ms. Arzeda, did you have any questions for the debtor? Yes, just a few.

Thank you. Good afternoon, Mr. Ralls. Hello.

I'm looking at your amended Statement of Financial Affairs and it looks like you amended your income to $52,500. Do you remember making that amendment? What page are you looking at? The first page of your Statement of Financial Affairs. Hold on one second.

Question number four. You had previously listed your income from wages and commissions at approximately $98,000 and it looks like you amended it. Yes.

We did amend it because we noticed that it said it didn't ask for a yearly amount. It asked for the amount through a specific period of time. Did you get paid $52,500 up through the petition date in wages from a job? Yes, from the job that I do.

That's what we calculated that my income was up until the petition date, I believe is what the request was. Okay. And so what you've been talking about today is that money that you take from Metaversal or that you use from Metaversal to pay your personal expenses.

Is that right? That's correct. And so the $52,500 is not really wages and commissions. It's really from the business because you don't really pay yourself a paycheck per se.

Is that true? That's true. It's my taxable income. And so do you get a W-2 or a 1099? Yeah, I'm a 1099.

All right. So you don't just get a K-1. You actually get a 1099.

Yeah, I think that's how I've always done it. I don't have an accountant right now, but that's how my old accountant treated it. Okay.

So historically, a 1099 was issued for whatever you paid yourself or allocated for your personal expenses for the year from Metaversal? Yes, and also from anyone. I've never been an employee of Headers.com since 2017. Okay.

And so in addition to that, on question number four, it says there's additional income that's listed as unknown. Have you received additional income this year from some other source other than what we've been talking about? Additional income? Where are you looking? All right. So still question number four where it says that you've earned, the first part of question number four has you listing $52,500 that you've received this year in wages, commission, bonuses, and tips.

And then just under that, it says you have also received unknown gross income from operating a business. And so is there additional income that you have received from somewhere else other than what we've been talking about? No. This is my only job.

Okay. And then the money you're saying that you have received

year-to-date as of the bankruptcy filing, the total amount of income you've received is the $52,500? That's correct. That's my taxable income.

And so, yeah, but not just your taxable income, so your gross income. And so have you received income or monies from anywhere else? No. I don't have any other jobs.

And then in the last two years, have you received any other income other than that income from Metaversal and what we've been talking about today? No. In the past two years, this has been my only job is Earth.com and EarthSnap. All right.

For lawsuits on this Statement of Financial Affairs, within the last 12 months before the bankruptcy filing for the last year, you have one lawsuit listed, and you say the nature of the case, you've got declaratory judgment $2.5 million and that that litigation had concluded. Is that right? I believe that's correct. I don't know if it's concluded or not because we never signed a settlement agreement, and now it's being contested.

Well, for the status of the case, is the case still pending? Is that litigation still ongoing? I don't think so, but I need to ask Kevin about that. Okay. Is it on appeal? I don't believe so.

Okay. Have you had any other lawsuits pending in the last year? No. Have you had any of your property repossessed, garnished, or seized in the last year? No.

Have you transferred or sold any property in the last two years? No. All right. Question number 14 says, within two years before you filed bankruptcy, did you give any gifts or contributions with the total value of more than $600 to any charity? And you've got no.

Is that true? That's true. Okay. Your amended schedules list that you're making charitable contributions of $300 a month, is that a mistake? Yeah, it should be $300 a year.

It should be $300 a year? I do $25 a month, too. It's not the SPCA, but it's a local branch. In the last 12 months, have you had any losses due to fire, theft, or gambling? No.

Your statement of financial affairs says you haven't paid anyone for bankruptcy services in the last 12 months. I'm assuming that's a mistake as well. I'm assuming you paid Mr. Wiley something to file this bankruptcy case? Me, personally? No, I did not.

Okay. So you personally did not pay Mr. Wiley to file the

bankruptcy case? No. He testified on the last call that he charged my mom with an Amex card.

Okay. And so on the question where it says, within one year before you filed bankruptcy, did you or anyone else acting on your behalf pay or transfer any money to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition? That still should be a yes, even though you personally did not pay it. Is that true? Well, if you said it's true, then yes, I'd have to ask Kevin why it's not done correctly.

And how much did your mom pay Mr. Wiley? $9,000. And then, do you have a safety deposit box? No. Do you have a storage unit? No.

Is anyone holding any property that belongs to you? No. Are you holding any property that belongs to someone else? No. All right.

For the businesses, you listed that you were a previous owner in PlantStat from January 2012 to May 2021. Is that true? Yes. That's when I was removed from PlantStat in May 2021.

Okay. And then the three businesses that you say that you currently personally own an interest in are EarthSnap Inc.,

Metaversal Knowledge Inc., and Digital Earth Media Inc. Is that correct? Yes, as of the time of the filing.

Since then, I have, as I mentioned earlier, started a new LLP in Texas called Green Mind. Right. Financial statements given in the last 12 months, you say that you gave a financial statement to Jeffrey Brennan in April of 2023.

Any other financial statements that you provided to anyone in the last two years? Not that I recall, no. Going back to your amended schedules, have you owned a house or any real estate in the last four years? No. Have any of the businesses that you've owned or had an interest in owned a house or any real estate in the last four years? No.

The income that you referenced earlier, that for Digital Earth Media, you said it had collected roughly $750,000 and about 80% of that was transferred to Metaversal. Is that accurate? Yes, ma'am. I don't know specific numbers.

I don't have that in front of me, but that's a good estimate. Okay. And so there's about $450,000 based on the 1.2 gross figure of earned income, the collected of $750,000.

What is a typical payment on a receivable? It's like that

$450,000. When do you expect that to be paid? We earned $275,000 in revenue in September. We've earned $120,000 so far in October.

We did $90,000 in August. So August revenue would be received this month. September revenue would be received in November and December.

And October revenue will be received in December and January. So is it fair to say that the receivables are generally collected between 60 and 90 days? It's usually 30 to 60 days net, which is 30 days after the end of each month. Revenue numbers are reconciled and then paid either 30 or 60 days after the end of the month.

They call it 30 days net or 60 days net. All right. I don't have any other questions at this time.

Thank you. Thank you, Ms. Arceda. Mr. Wiley, before we conclude the first meeting of creditors, I would note once again for the record that you have not filed an employment application in the case and would ask you to do so.

It has been filed. It has been filed. I think that the problem is that we have a joint administration motion pending and the

judge has not issued an order on the joint administration.

So we'll get to that. Mr. Wiley, I understand you have a motion for joint administration pending in the Sherman Division plant SNAP case. Correct.

We filed the application in the Earth SNAP case and put joint administration. We have the application pending. So we're waiting for the order on the joint administration.

You'll need to file a separate employment application in the individual Eric Ralls Chapter 11 case. And I would note for you that that is in the Tyler Division. And so that joint administration motion, Mr. Wiley, may be held up given that it's essentially before two different judges.

I see. I see the problem. Thank you so much for pointing it out, sir.

And so I would ask you to please file your employment application and disclose your sources of compensation, of course, in the affidavit that supports that. Can you do that? Yes, I'm sure it's on the line. She'll definitely take care of that.

Thank you so much. Thank you. And in addition to that, Mr. Wiley, to the extent that the schedules and statement of financial affairs need to be amended to accurately reflect the debtor's assets and liabilities, will you agree to do that within seven days of this meeting? Yes, sir.

Thank you. I hereby conclude this first meeting of creditors in Eastern District of Texas Bankruptcy Case, Tyler Division, case number 24-60504, Eric Ralls.

(Proceedings concluded)

**C E R T I F I C A T I O N**

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

Kathleen M. Price ____________ DATE: October 24, 2024

Kathleen Price, AAERT Cert. No. 325

A&S Transcript Providers